UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LAURA PHILLIPS,

                                        Plaintiff,

                                                                6:16-CV-0219
v.                                                              (LEK/TWD)

LUCY DAWES, et al.,

                                        Defendants.
_____

APPEARANCES:

LAURA PHILLIPS
Plaintiff *pro se*
43 Auburn Avenue
Utica, New York 13501

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

        The Clerk has sent to the Court for review the *pro se* amended complaint of Plaintiff

Laura Phillips in this employment discrimination action brought pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and the American with

Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.*, against Central New York

Psychiatric Center ("CNYPC"), Employee Health Service of New York State ("EHS"), and

eleven individuals, Lucy Dawes, Josie Slifka, Rosemary Palmer, Lisa Helmer, Dr. Siddigi, Dr.

Stang, Christine Mandigo, Pat Bardo, Dr. Wapner, Dr. Crulla, and Walter P. Bowler

(collectively, "the individual Defendants"), all of whom are alleged to be employees of CNYPC,

EHS, New York State, or independent medical professionals.  (Dkt. No. 9.)  Also before the

Court is Plaintiff's motion for the appointment of counsel.  (Dkt. No. 4.)

# I.      BACKGROUND AND PROCEDURAL HISTORY

On August 17, 2015, Plaintiff, a registered nurse, filed a complaint against her employer,

CNYPC with the New York State Division of Human Rights ("NYSDHR"), alleging

discrimination based upon race and disability.  (Dkt. No. 9 at 11.[1])  Plaintiff alleges that on

August 8, 2014, continuing through October 29, 2014, she was subjected to unwelcome

comments regarding her disability and race from her supervisor and coworkers.  *Id*.  Plaintiff

states that she is bi-racial, but provides no information regarding her disability.  *Id*.  She alleges

that she was wrongly accused of making medication errors, "being disheveled," and being a

danger to others.  *Id*.  Plaintiff alleges that she was required to complete a "skills packet" that

other registered nurses were not required to complete.  *Id*.  Plaintiff avers that on or about

October 29, 2014, she was forced to take mandatory medical leave and receive psychological

testing.  *Id*.  She further alleges that CNYPC threatened to report Plaintiff to the New York State

Department of Education for misconduct so that her nursing license would be revoked.  *Id*.

Based upon its investigation, the Equal Employment Opportunity Commission ("EEOC")

was "unable to conclude that the information obtained establishe[d] a violation of the statutes."

*Id*. at 10.  The EEOC issued a right-to-sue letter dated November 23, 2015.  *Id*.

Plaintiff timely commenced this action utilizing a form civil complaint pursuant to Title

VII on February 23, 2016.  (Dkt. No. 1.)  Plaintiff also filed a motion to proceed *in forma*

*pauperis* ("IFP application") and a motion for the appointment of counsel.  (Dkt. Nos. 2, 4.)  On

April 18, 2016, Plaintiff's IFP application was denied as incomplete.  (Dkt. No. 5.)  On May 18,

2016, Plaintiff filed a second IFP application (Dkt. No. 6), along with 177 pages of supporting

---

[1] References to the allegations in the amended complaint are to the page numbers assigned by the
Clerk's CM/ECF system.

documents (Dkt. No. 7).  On June 9, 2016, this Court granted Plaintiff's second IFP application and ordered Plaintiff to file a signed complaint that included a demand for relief pursuant to Rules 8(a)(3) and 11(a) of the Federal Rules of Civil Procedure.  (Dkt. No. 8.)  Plaintiff timely filed her amended complaint on June 29, 2016.  (Dkt. No. 9.)

## II.     ALLEGATIONS OF THE AMENDED COMPLAINT

Generally, Plaintiff alleges that she was discriminated against on account of her race, color, sex, age, and disability.  *Id*. at 3.  Plaintiff's discrimination claims include: failure to employ, termination of employment, failure to promote, unequal terms and conditions of employment, reduction in wages, and retaliation.  *Id*.

Plaintiff also alleges that she was forced into agreeing with a prosecutor at the New York State Education Department that she is guilty of misconduct, even though she is not.  *Id*. Specifically, she was told that if she did not "settle," she would be charged with "misconduct." *Id*.  According to Plaintiff, Defendants withheld information after she was told she was not fit for duty and she was subjected to "insults working in muck."  *Id*.  Plaintiff also alleges state tort claims against various individual Defendants.  *Id*. at 5.

Plaintiff started working at CNYPC in August, 2014.  *Id*. at 4.  She states that she could immediately "feel the dislike" and that there was "no warmth [and] no greeting."  *Id*.  She alleges that she was "set up" and "put in dangerous situations."  *Id*.  Plaintiff claims that she was the only nurse in training that "they" treated like a prisoner.  *Id*.  On October 3, 2014, Plaintiff was instructed to go to personnel before work.  *Id*.  That same day, she was placed on mandatory involuntary leave for medical reasons.  *Id*.  She was also given a "2000 page dissertation of libel and slander."  *Id*.  According to Plaintiff, she was then sent to a doctor who found her not fit for duty and an emotional wreck.  *Id*.

Plaintiff states that she is biracial and has a disability. *Id.* Plaintiff alleges that because she is a minority, an "all white staff tried to get [her] out." *Id.* at 4. Plaintiff further alleges that "they" tried to fire her any way they could because she is "older, slow, with frizzy hair, [and] dry smacking, sweating, disgusting body[.]" *Id.*

Plaintiff also alleges she was singled out and sent to the hospital by medical staff, even though other personnel who were not feeling well with similar symptoms were allowed to go home. *Id.* at 5. Plaintiff alleges that while she was prevented from working, she did not receive any wages. *Id.* She further claims that human resources violated her "hippa rights" by informing "SS" that she "called in a lot" and that she "did not really want to work." *Id.*

Finally, Plaintiff alleges that "there is more" but she will let her "notes dictate harassment." *Id.* She claims that her livelihood and "belief in self" have been taken away. *Id.* She is scared to work as a nurse, and further claims that both her nursing and personal reputations have been ruined. *Id.*

On May 18, 2016, Plaintiff filed 177 pages of documents. (Dkt. No. 7.) According to Plaintiff, because of the constant harassment and discrimination, she was forced to give her two weeks' notice to CNYPC on February 22, 2016. (Dkt. No. 7-3 at 1.) Plaintiff further alleges that she is being blackmailed by CNYPC and EHS and that New York State is further penalizing her because she spoke out against their practices. As a result, she suffers from this "backlash." (Dkt. Nos. 7-5, 7-6, 7-7.)

Plaintiff seeks $20,000.00 in damages for pain, suffering, and trauma, including time spent away from her mother. *Id.* at 6. Plaintiff requests that "this record [be] sealed so that no one else can have access to it except for" Plaintiff or her designee. *Id.* Lastly, Plaintiff indicates that she would like to work for New York State again, but not necessarily for CNYPC. *Id.*

## III.    SCREENING OF THE AMENDED COMPLAINT

Having previously found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis* (Dkt. No. 8), the Court must consider the sufficiency of the allegations set forth in the amended complaint (Dkt. No. 9) pursuant to 28 U.S.C. § 1915(e).  Section 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*.

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## IV. ANALYSIS

### A. Eleventh Amendment Immunity

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity." *Gorton v. Gettel*, 554 F.3d 60, 62 (2d Cir. 2009) (citation and internal quotation marks omitted). Eleventh Amendment immunity extends to

"state agents and state instrumentalities that are, effectively, arms of a state." *Id.* at 62 (citation and internal quotation marks omitted).

The Court takes judicial notices that CNYPC and EHS are state instrumentalities.[2] *Abdul-Matiyn v. Pataki*, No. 2008 WL 974409, at *14 (N.D.N.Y. Apr. 8, 2008) (CNYPC "is an arm of the state" for Eleventh Amendment purposes); *Clark v. Dominique*, 798 F. Supp. 2d 390 (N.D.N.Y. June 28, 2011) (EHS entitled to Eleventh Amendment immunity). Thus, CNYPC and ESH are entitled to immunity absent a waiver or abrogation of its Eleventh Amendment immunity. *See Lee v. Saltzman*, No. 10-CV-1038, 2011 WL 5979162, at *3 (W.D.N.Y. Nov. 27, 2011).

Congress has not abrogated and New York has not waived immunity from claims brought under the ADA. *Trivedi v. New York Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 722 (S.D.N.Y. 2011); *see also Hamzik v. Office for People with Developmental Disabiliti*es, 859 F. Supp. 2d 265, 275 (N.D.N.Y. 2012) (Eleventh Amendment precludes plaintiff from seeking any relief against state agencies—including monetary and injunctive relief); *Lee v. Saltzman*, No. 10-CV-1038, 2011 WL 5979162, at *3 (W.D.N.Y. Nov. 27, 2011).

However, Title VII claims are not barred by the Eleventh Amendment. *See Dillard v. Runyon*, 928 F. Supp. 1316, 1322 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997)

---

[2] According to its website, CNYPC "is a comprehensive mental health service delivery system providing a full range of care and treatment to persons incarcerated in the New York State and County Correctional Systems." https://www.omh.ny.gov/omhweb/facilities/cnpc/ (last visited July 13, 2016). In addition, EHS "provides a comprehensive range of occupational health and medical evaluation services for all New York State departments and agencies. EHS fulfills its mission to promote and maintain the highest degree of individual employee health in New York State workplaces by assisting agencies with," *inter alia*, "evaluation of the physical and mental capacity of workers to perform their jobs safely and effectively[.]" https://www.cs.ny.gov/ehs/index.cfm (last visited July 13, 2016).

(Congress abrogated states' immunity for Title VII discrimination claims alleging discrimination in a government workplace on the basis of race, sex, color, religion, or national origin.)

## B.      Title VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a) (2006).  A plaintiff asserting a claim under Title VII may establish a prima facie case by showing that (1) she belonged to a protected class; (2) she was qualified for the position held; (3) an adverse employment action occurred; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

Plaintiff has sued her former employer, CNYPC under Title VII.  (Dkt. No. 9 at 3-5.) She has alleged facts plausibly suggesting her membership in a protected class and that the alleged adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *Id*.  Plaintiff declares that she is bi-racial.  *Id*. at 4.  She further alleges that the "all white staff" tried to get her out.  *Id*.  The EEOC issued Plaintiff a right to sue letter, and she timely commenced this action.  *Id*. at 10.

Therefore, the Court recommends that Plaintiff be allowed to proceed against CNYPC on her Title VII claim.  The Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

Construed liberally, Plaintiff also brings a Title VII claim against EHS.  (*See generally* Dkt. No. 9.)  However, as it is patently clear from Plaintiff's pleadings that CNYPC is her

employer, the Court recommends dismissing Plaintiff's Title VII claim against EHS without prejudice.

In addition, it is well settled that individuals are not subject to liability under Title VII. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Garibaldi v. Anixter, Inc.*, 407 F. Supp. 2d 449, 451 (W.D.N.Y. 2006). Therefore, the Court recommends that Plaintiff's Title VII claims against the individual Defendants, Lucy Dawes, Josie Slifka, Rosemary Palmer, Lisa Helmer, Dr. Siddigi, Dr. Stang, Christine Mandigo, Pat Bardo, Dr. Wapner, Dr. Crulla, and Walter P. Bowler, be dismissed with prejudice.

### C.    ADA

Title I of the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that h[er] employer is subject to the ADA; (b) that [s]he is disabled within the meaning of the ADA or perceived to be so by h[er] employer; (c) that [s]he was otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (d) that [s]he suffered an adverse employment action because of [her] disability."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

Here, Plaintiff does not establish a case of disability discrimination under the ADA because, among other reasons, she has not shown that she was disabled, or was regarded as disabled.  *See McNamara v. Tourneau, Inc.*, 496 F. Supp. 2d 366, 375 (S.D.N.Y. 2007) (citing *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)); *Giordano v. N.Y.C.*, 274 F.3d

740, 747 (2d Cir. 2001). The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." *Capabianco v. New York City*, 422 F.3d 47, 56 (2d Cir. 2005); *see* 42 U.S.C. § 12102(2). "A disability under the ADA 'does not include temporary medical conditions, even if those conditions require extended leaves of absence from work' because such conditions are not substantially limiting." *Zurenda v. Cardiology Assoc., P.C.*, No. 3:10-CV-0882 (TJM), 2012 WL 1801740, *8 (N.D.N.Y. May 16, 2012) (quoting *Huskins v. Pepsi Cola of Ogdensburg Bottlers, Inc.*, 180 F. Supp. 2d 347, 351-52 (N.D.N.Y. 2001)); *see also Graaf v. North Shore Univ. Hosp.*, 1 F. Supp. 2d 318, 321 (S.D.N.Y. 1998) ("Courts within this circuit and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary disabilities are not disabled persons within the meaning of the act.").

Moreover, in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 363-64, 368-74 (2011), the Supreme Court held that Title I of the ADA does not validly abrogate a State's Eleventh Amendment immunity, despite Congressional intent to do so. *See Office for People with Developmental Disabilities*, 859 F. Supp. 2d 265, 275 (N.D.N.Y. 2012) (Eleventh Amendment precludes plaintiff from seeking any relief against state agencies – including monetary and injunctive relief); *Federal Maritime Com'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 765 (2002) ("[S]overeign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief [against a state instrumentality].").  Nor has the State waived its immunity with regard to claims under Title I of the ADA.  *See Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482,

498 (S.D.N.Y. 2009). Therefore, the Court recommends dismissing Plaintiff's ADA claims against Defendants CNYPC and EHS with prejudice.

Employees of state instrumentalities are also immune from suit for money damages absent a waiver or abrogation of Eleventh Amendment immunity from claims brought against them in their official capacity. *See Gorton*, 554 F.3d at 62 (Eleventh Amendment immunity extends to state agents acting in their official capacity). However, a state official's immunity does not extend to claims for prospective equitable relief asserted against the official in his or her official capacity. *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir.2007) (punctuation omitted); *see Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 369 (W.D.N.Y. 2009) (Eleventh Amendment does not bar claims for prospective equitable relief against state officials sued in their official capacities) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

While the Second Circuit has not yet squarely addressed the issue, district courts in this Circuit have concluded that defendants may not be held individually liable under Title I of the ADA. *See, e.g.*, *D'Entremont v. Atlas Health Care Linen Services, Co., LLC*, No. 1:12-CV-0060 (LEK/RFT), 2013 WL 998040, at *5 (N.D.N.Y. Mar. 13, 2013) ("A defendant may not be held individually liable under Title I of the ADA."); *Rosero v. Supreme Systems, Inc.*, No. 11 CV 4062 (CBA)(LB), 2012 WL 3542021, at *3 (E.D.N.Y. Apr. 24, 2012) ("There is no individual liability under . . . the ADA.").

Here, Plaintiff seeks monetary compensation for pain, suffering, and trauma. (Dkt. No. 9 at 6.) Plaintiff further states that she would "like to work for New York State again, not necessarily CNYPC." *Id*.

In light of the foregoing, the Court recommends that (1) Plaintiff's ADA claims for monetary damages against the individual Defendants, in their individual and official capacities,

be dismissed with prejudice.  However, the Court recommends that Plaintiff's ADA claims for equitable relief against the individual Defendants in their official capacities, be dismissed without prejudice, in the event as yet unpleaded facts exist that support the claim.

### D.  HIPAA

Plaintiff alleges "Human Resources told SS that I had called in a lot & I did not really want to work [in] violation of my hippa rights."  (Dkt. No. 9 at 4.)  Courts have overwhelmingly concluded that there is no private right of action under the Health Insurance and Portability Accountability Act ("HIPAA"), 42 U.S.C. 1320, et seq.  *See Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) (collecting cases across multiple circuits and district courts); *see also Wilkerson v. Shinseki,* 606 F.3d 1256*,* 1267 n.4 (10th Cir. 2010); *Miller v. Nichols*, 586 F.3d 53, 59 (1st Cir. 2009); *Acara v. Banks*, 470 F. 3d 569, 572 (5th Cir. 2006).  Therefore, the Court recommends that Plaintiff's HIPAA claim be dismissed with prejudice.

### E.  State Tort Claims

Construed liberally, Plaintiff alleges numerous state tort claims against various of the individual Defendants.  (*See generally* Dkt. No. 9.)  Inasmuch as the Court is recommending dismissal of all claims against the individual Defendants, the Court further recommends that the District Court decline to exercise supplemental jurisdiction over any state law claims alleged against any of the individual Defendants pursuant to 28 U.S.C. § 1367.

### F.  Filing Under Seal

In her Prayer for Relief, Plaintiff states, "I want this record sealed so that no one else can have access to it except me or my designate."  (Dkt. No. 9 at 6.)  Both the common law and the first amendment protect the public's right of access to court documents.  *Matter of New York*

*Times Co.,* 828 F.2d 110, 114 (2d Cir. 1987), *cert. denied*, 485 U.S. 977 (1988). Under the common law right to access, a presumption of public access attaches to any "judicial document," defined as a document "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).

The right of access, however, is not absolute. It can be overcome by a showing that placing the documents in question under seal will further other substantial interests, for example, a criminal defendant's right to a fair trial or a third party's privacy interests. *New York Times Co.*, 828 F.2d at 116.

Privacy concerns are also addressed by the Local Rules of this District. Local Rule 8.1, provides that "parties shall refrain from including, or shall redact where inclusion is necessary, the following personal identifiers from all filings with the Court, including exhibits thereto, whether filed electronically or in paper form, unless the Court orders otherwise[:]" (1) social security numbers; (2) names of minor children; (3) dates of birth; (4) home addresses; and (5) names of sexual assault victims. N.D.N.Y. L.R. 8.1. In addition, "caution shall be exercised when filing documents that contain the following: (1) personal identifying numbers, such as a driver's license number; (2) medical records, treatment and diagnosis; (3) employment history; (4) individual financial information; and (5) propriety or trade secret information." *Id.*

Nonetheless, court documents may be sealed only if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986) (internal quotation omitted); *accord New York Times Co.*, 828 F.2d at 116. The party seeking to file a document under seal bears the burden of demonstrating that sealing is warranted. *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

Here, Plaintiff has failed to make the requisite showing to justify sealing the entire record at this time. Therefore, Plaintiff's request is denied.

## V.     MOTION FOR THE APPOINTMENT OF COUNSEL

Plaintiff has moved for the appointment of counsel. (Dkt. No. 4.) When moving for the appointment of counsel, a party must demonstrate that she is unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 173-74 (2d Cir. 1989) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)). Plaintiff declares that she has contacted Richard Wolfe, Esq., Phillip G. Steck, and Attorney General Erik T. Schneiderman, in an effort to obtain counsel. (Dkt. No. 4 at ¶ B.) However, Plaintiff fails to attach to her motion any correspondence that she received from the attorneys listed above. *See id* at ¶ C. Thus, Plaintiff's motion for the appointment of counsel is incomplete.

In addition, "in deciding whether to appoint counsel . . . the [court] should first determine whether the indigent's position seems likely to be of substance." *Hodge*, 802 F.2d at 61. Once this threshold is met, the court is required to consider other criteria "such as the factual and legal complexity of the case, the ability of the litigant to navigate the legal minefield unassisted, and any other reason why in the particular case appointment of counsel would probably lead to a more just resolution of the dispute." *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001).

Even if Plaintiff had shown that she is unable to obtain counsel through the private sector or public interest firms, a more fully developed record would be necessary before an assessment can be made as to whether counsel should be appointed. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of merit of the underlying dispute in

determining whether to appoint counsel). Accordingly, Plaintiff's motion for the appointment of counsel (Dkt. No. 4) is denied without prejudice at this time.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Plaintiff's Title VII claim be allowed to proceed against Defendant CNYPC, and that Defendant CNYPC, or its counsel, be required to file a response as provided for in Rule 12 of the Federal Rules of Civil Procedure; and it is further

**RECOMMENDED** that the following claims be **DISMISSED WITH PREJUDICE**: (1) Plaintiff's Title VII claims against the individual Defendants, Lucy Dawes, Josie Slifka, Rosemary Palmer, Lisa Helmer, Dr. Siddigi, Dr. Stang, Christine Mandigo, Pat Bardo, Dr. Wapner, Dr. Crulla, and Walter P. Bowler; (2) Plaintiff's ADA claims against Defendants CNYPC and EHS; (3) Plaintiff's ADA claims for monetary damages against the individual Defendants, Lucy Dawes, Josie Slifka, Rosemary Palmer, Lisa Helmer, Dr. Siddigi, Dr. Stang, Christine Mandigo, Pat Bardo, Dr. Wapner, Dr. Crulla, and Walter P. Bowler; and (4) Plaintiff's HIPAA claim; and it is further

**RECOMMENDED** that the following claims be **DISMISSED WITHOUT PRJEUDICE**: (1) Plaintiff's Title VII claim against Defendant EHS and (2) Plaintiff's ADA claims for equitable relief against the individual Defendants, Lucy Dawes, Josie Slifka, Rosemary Palmer, Lisa Helmer, Dr. Siddigi, Dr. Stang, Christine Mandigo, Pat Bardo, Dr. Wapner, Dr. Crulla, and Walter P. Bowler, in their official capacities, and it is further

**RECOMMENDED** that the Court decline to exercise supplemental jurisdiction over any state law claims alleged against any of the individual Defendants, and it is hereby

**ORDERED** that Plaintiff's request to file under seal is **DENIED WITHOUT PREJUDICE**; and it is hereby

**ORDERED** that Plaintiff's motion for the appointment of counsel (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE**, and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: July 14, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2008 WL 974409
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen,
Correction Officer; Rowe, Correction Officer;
Valezquez, Correction Officer; Benbow, Correction
Officer; Johnson, Sullivan Correctional Facility
Senior Parole Officer; John Doe, 1, Sullivan
Correctional Facility Audiologist; John Doe 2,
Sullivan Correctional Facility Counselor; Walsh,
Sullivan Correctional Facility Superintendent; John
Doe 3, Sullivan Correctional Facility Psychiatrist;
John Doe # 4, Cnypc Psychiatrist; Elizabeth
Farnum, Doctor; Debroize, Doctor; Forshee,
Doctor; Pete Hanmer, Cnypc Primary Therapist;
Tom Murphy; Jeff Nowicki; Sharon Barboza,
Director Cnypc Sotp Program; Sawyer, Director,
Cnypc; Cnypc Medical Staff; Michelle Payne,
Former Cnypc Program Rehabilitation Counselor;
Steve Capolo; and Linda Becker, Defendants.

No. 9:06-CV-1503 (DNH)(DRH).
|
April 8, 2008.

**Attorneys and Law Firms**

Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney
General State of New York, Gerald J. Rock, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC
Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq.,
of Counsel, Buffalo, NY, for Defendants Allen, Rowe,
Valezquez, and Benbrow.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Faris Abdul-Matiyn, brought this civil
rights action pursuant to 42 U.S.C. § 1983. By a
voluminous Report-Recommendation dated February 19,
2008, the Honorable David R. Homer, United States
Magistrate Judge, addressed the numerous issues in this
matter with the recommendations that:

1. The motion of Walsh and Johnson to sever be denied;

2. The motion of Walsh and Johnson to dismiss be granted
as to plaintiff's conspiracy claim against defendant
Johnson for failure to intervene, and denied in all other
respect;

3. The state defendants' motion to dismiss be granted in
all respects as to defendant Sawyer; granted in all respects
as to plaintiff's claim for denial of access to the courts, and
denied in all other respects;

4. The City defendants' motion to dismiss be denied in all
respects;

5. The motion of defendant CNYPC Medical Staff to
dismiss be granted; and

6. The complaint be dismissed without prejudice as to
defendants George Pataki, Michelle Payne, and John
Does I-IV.

No objections to the Report-Recommendation have been
filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Homer, the
Report-Recommendation is accepted and adopted in its
entirety. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is
DENIED;

2. Defendant Walsh and Johnson's motion to dismiss is
GRANTED with regard to plaintiff's conspiracy claim

against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.


## REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, [2] twelve DOCS employees [3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions

to dismiss from the State defendants (Docket Nos. 44, 47), [4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

[2]    Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

[3]    Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

[4]    The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.


## I. Background

**\*2** The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ..," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ...," he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

*\*3* Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16. [5] The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them [6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

[5]     At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

[6]     Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then

strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him," including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

 **\*4** Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals [7] ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

[7] "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s due to his religion or if he w[as] physically ill." *Id.* at 23. Abdul-Matiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

## II. Discussion

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to

comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies, [9] and (4) allege a serious medical need. The CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

[8] Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

[9] "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921 (2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

### A. Legal Standard

**\*5** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations

omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of the matters set forth, so that allegations might easily be

referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

**\*6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

### C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent

in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

**\*7** As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they

were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### D. Severance

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately."

Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

> (1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**\*8** *Id.* at *3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

**E. Failure to State a Claim**

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

**1. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and

worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted

far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

**\*10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

### 2. Fourteenth Amendment

### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988)

(citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (*citing Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera [nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at \*6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection [10]

[10] Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those

convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment

### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray.

The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (*citing Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants'

motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

### b. Refusal to Allow Prayer

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

**\*13** Therefore, the State defendants motion on this ground should be denied.

### ii. Access to Courts

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531. "[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on

the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

**4. Conspiracy**

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights." Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing these allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support

a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground should be granted in part and denied in part.

**F. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at \*12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

**III. Conclusion**

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2008 WL 974409

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.     13

2011 WL 5979162
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

John Yang LEE, Plaintiff,
v.
Alan R. SALTZMAN, Ellen P. Rich, and State
University of New York at Buffalo, Defendants.

No. 10–CV–103S.
|
Nov. 27, 2011.

**Attorneys and Law Firms**

John Yang Lee, Brooklyn, NY, pro se.

Michael A. Siragusa, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**\*1** 1. On February 28, 2011 *pro se* plaintiff John Yang
Lee filed an Amended Complaint in the Western District
of New York claiming violations by Defendants Alan
R. Saltzman, Ellen P. Rich, and the State University of
New York at Buffalo ("SUNY") of 42 U.S.C § 1981,
Title VII of the Civil Rights Act of 1964 ("Title VII"),
42 U.S.C. §§ 2000e2000e–17, the New York State Human
Rights Law ("NYHRL"), N.Y. Exec. Law § 290–296 *et
seq.,* as well as state law claims for breach of contract
and tortious interference. Plaintiff alleges that Defendants
racially discriminated against him throughout his first
year residency course and continue to deny him first
year credits necessary for issuance of a medical license.
Presently before this Court is Defendants' Motion to
Dismiss. For the following reasons, Defendants' motion is
granted.

2. On February 8, 2011, Plaintiff filed his original
Complaint against Defendants Saltzman and Rich.
(Docket No. 1.) At that time, Defendants moved to
dismiss Plaintiff's Complaint. (Docket No. 4.) Plaintiff
filed a motion to amend his Complaint and add SUNY
as a defendant. (Docket No. 11.) Plaintiff's motion was

granted, and this Court denied as moot Defendants' first
Motion to Dismiss. Plaintiff filed an Amended Complaint
on February 28, 2011. (Docket No. 15.) Defendants,
now joined by SUNY, again move to dismiss. (Docket
No. 16.) Along with their motion, Defendants filed a
Memorandum of Law in Support of Defendants' Motion
to Dismiss Plaintiff's Amended Complaint. (Docket No.
17.) Plaintiff filed a Response (Docket No. 19) on April
4, 2011, and Defendants filed a Reply Memorandum
(Docket No. 20) on April 11, 2011. Plaintiff filed his own
second Response Memorandum on July 5, 2011. (Docket
No. 21.)

3. For purposes of adjudicating the present motion,
this Court assumes the truth of the following factual
allegations contained in Plaintiff's Complaint. *See
Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton
Coll.,* 128 F.3d 59, 63 (2d Cir.1997). In approximately
2004, Plaintiff was offered a 3–year residency position
with SUNY's internal medicine residency program.
(Complaint ("Comp."), Docket No. 1, ¶ 7.) Plaintiff's
performance was found satisfactory for the first three
months of the program. (*Id.* ¶ 8.) Plaintiff then learned
that Defendant Saltzman, the chairman of SUNY's
department of medicine, had claimed to dislike Chinese
persons. (*Id.* ¶ 9.) Saltzman was also part of a two-week-
rotation which included Plaintiff, and Plaintiff was the
only member in the residency program of Chinese origin.
(*Id.*) Defendants' conduct following this initial incident
may be summarized as follows. Between January 3, 2005
and January 16, 2005 Saltzman remarked that Plaintiff
was in the wrong field because of his accent and that his
Chinese medical education was inferior to that of even
a third year medical student. (*Id.*) On January 10, 2005
Saltzman sent a letter, of which Plaintiff came aware
only in September 2007, to Defendant Rich, the residency
program director, asking him to terminate Plaintiff's
residency. (*Id.* ¶ 10.) On January 24, 2005, Rich put
Plaintiff on probation. (*Id.* ¶ 11.) Saltzman then canceled
Plaintiff's mid-term evaluation by the Intern & Residency
Evaluation Committee and began to manipulate Plaintiff's
evaluation forms. (*Id.* ¶ 14.) On March 14, 2005 Rich
informed Plaintiff that his contract would not be renewed
and that he would need to find a second year position
elsewhere. (*Id.* ¶ 16.) However, Defendants did not release
Plaintiff's first year credits, preventing Plaintiff from
securing a second year position. (*Id.* ¶ 17.) Plaintiff
accused Saltzman of influencing his evaluations and,
in response, Defendants compelled one of Plaintiff's

supervisors to fabricate a bad record that would assist Defendants in immediately terminating Plaintiff. (*Id.* ¶ 19.) Plaintiff sought an appeal, but was denied on June 13, 2005. (*Id.* ¶ 20.) Eventually, Defendants did terminate Plaintiff, awarding him only 10.5 credits, instead of the usual 12 because of an unsatisfactory rotation during his first year of residency. (*Id.* ¶ 21.) On June 19, 2005 Plaintiff requested, and was denied, a training extension and was also denied transfer to an alternative specialty. (*Id.* ¶¶ 22, 23.) Defendants also refused Plaintiff's later request in July 2005 that the program allow him to make up the last two months of residency. (*Id.* ¶ 24.) Plaintiff was also denied the right to a special appeal. (*Id.* ¶ 26.)

**\*2** Plaintiff continued speaking out against Defendants. In April 2006 he reported the alleged discrimination to the Director of Graduate Medical Education, Associate Dean Roseanne C. Berger. (*Id.*) Plaintiff was then permitted to complete a standardized patient exercise. (*Id.* ¶ 28.) But, despite performing well, Defendants continued to reject his requests to return to the residency program. (*Id.*) Most recently, on February 5, 2009, the Committee on the Professions of New York determined that Plaintiff had satisfied his preprofessional education requirements for licensure. (Comp.¶ 32.) However, Defendant Rich denied Plaintiff credit for his residency, preventing issuance of the Plaintiff's New York Medical license. (*Id.*)

4. In July 2006, Plaintiff reported Defendants' actions to the Equal Employment Opportunity Commission ("EEOC"). The EEOC found that his claims were time-barred. (*Id.* ¶ 29.) A similar result followed when Plaintiff reported his case to the state human rights department. (*Id.*) Plaintiff unsuccessfully sought redress by securing legal representation between June 2007 and October 2009. (*Id.* ¶¶ 30, 31.) Ultimately, Plaintiff proceeded *pro se* and, in October 2010, submitted a new complaint to the EEOC. (*Id.* ¶ 33.). On June 24, 2011 the EEOC sent Plaintiff a Dismissal and Notice of Rights, finding that it was unable to conclude that any statutes had been violated. (Plaintiff's Response to Defendants' Reply Memorandum of Law, Docket No. 21, Dismissal and Notice of Rights.)

5. Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." *Fed.R.Civ.P. 12(b)(6).* Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of the claim. *Fed.R.Civ.P. 8(a)(2).* But the plain statement must "possess enough heft to show

that the pleader is entitled to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007). When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008). Legal conclusions, however, are not afforded the same presumption of truthfulness. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 1945 (quoting *Twombly,* 550 U.S. at 570). Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Facial plausibility is present when the factual content of the complaint allows for a reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal,* 129 S.Ct. at 1949. The plausibility standard is not, however, a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. *Id.* at 1950; *Fed.R.Civ.P. 8(a)(2).* Well-pleaded allegations in the complaint must nudge the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Furthermore, this Court is aware of the distinct disadvantage at which *pro se* litigants are placed, and recognizes that federal courts routinely read submissions by *pro se* litigants liberally, interpreting them to raise the strongest arguments they suggest. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

**\*3** 6. Plaintiff brings claims under 42 U.S.C § 1981, Title VII, the NYHRL, and state law. At the outset, this Court notes that the majority of these claims are barred by the Eleventh Amendment. It is well settled that the Eleventh Amendment bars suits against states and state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100–02, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67 (1984); *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999). This Court is barred from "exercising jurisdiction over lawsuits against a state unless [the state] waive[s] sovereign immunity or Congress has expressly and validly abrogated that immunity." *A.A. v. Bd. of Educ., Central Islip Union Free Sch. Dist.,* 196

F.Supp.2d 259, 264 (E.D.N.Y.2002) (citing *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)). Furthermore, the Eleventh Amendment's protection extends to state officials being sued in their official capacities. *Papasan v. Allain,* 478 U.S. 265, 277, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office ... [and][a]s such, it is no different from a suit against the State itself." *Harris v. Queens County Dist. Attorney's Office,* No. 08–CV–1703 (CBA)(LB), 2009 WL 3805457, at *4 (E.D.N.Y. Nov. 2009) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

7. SUNY, for purposes of the Eleventh Amendment, is an integral part of the state government such that when it is sued, the State of New York is the real party. *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 (2d Cir.1990). "SUNY has clearly not consented to suit in a federal forum." *Id.* Similarly, Defendants Saltzman and Rich are identified, respectively, as chairman of the department of medicine and residency program director, and are thus clearly state agency officials. *See Whaley v. City Univ. of N.Y.,* 555 F.Supp.2d 381, 400–01 (S.D.N.Y.2008) ("State employment has generally been deemed sufficient to render the defendant a state actor." (internal quotation marks omitted)). Plaintiff is bringing suit against the individual Defendants because of decisions they made in their official capacities. All the allegations relating to Defendants' interference relate to their denial of Plaintiff's first semester residency credits. This is a decision within the scope of their official capacities. Accordingly, the Eleventh Amendment will constitute a bar to several of Plaintiff's claims against both SUNY and Defendants Saltzman and Rich.

8. Among the claims barred by the Eleventh Amendment are those claims Plaintiff brings under 42 U.S.C. § 1981 seeking to recover money damages for damage done to his career and mental health. "Congress has not abrogated the states' sovereign immunity under 42 U.S.C. § 1981." *Moshenko v. State Univ. of N.Y. at Buffalo,* No. 07–CV0116(A)(M), 2009 WL 5873236, at *4 (W.D.N.Y. Sep.16, 2009) (quoting *Smith v. State Univ. of N.Y.,* No. 1:00–CV1454(FJS/RFT), 2003 WL 1937208, at *7 (N.D.N.Y. Apr.23, 2003)). "Because the state has not waived its Eleventh Amendment immunity to claims brought under § 1981 ... these claims will be

dismissed and the Court need not reach their merits." *Concey v. New York State Unified Ct. Sys.,* No. 08 Civ. 8858(PGG), 2011 WL 4549386, at *7 (S.D.N.Y. Sep.30, 2011) (quoting *Koumantaros v. City Univ. of N.Y.,* No. 03 Civ. 10170(GEL), 2007 WL 840115, at *4 (S.D.N.Y. Mar.19, 2007)); *see also Bogle–Assegai v. Connecticut,* 470 F.3d 498, 509 (2d Cir.2006) (affirming dismissal of § 1981 claims against state and individual defendants in their official capacities on Eleventh Amendment immunity grounds). Accordingly, Plaintiff's § 1981 claims against all Defendants are barred by the Eleventh Amendment. *See Amna v. New York State Dep't of Health,* No. 08–CV–2806 (CBA)(LB), 2011 WL 4592787, at *16 (E.D.N.Y. Sep. 30, 2011) (dismissing § 1981 claims on Eleventh Amendment grounds).

**\*4** 9. The same result follows for Plaintiff's state law claims. Plaintiff brings discrimination and retaliation claims under the NYHRL. Plaintiff also brings breach of contract and tortious interference claims under state law. Because SUNY has not consented to suit, these claims must also be dismissed. *Moshenko,* 2009 WL 5873236, at *4 (noting that district courts in the Second Circuit have repeatedly held that NYHRL does not include waiver of state sovereign immunity in federal court); *Heba v. New York State Div. of Parole,* 537 F.Supp.2d 457, 471 (E.D.N.Y.2007) (holding that Eleventh Amendment bars suit against state agency under NYHRL and state law claims).

10. Beside money damages, Plaintiff also seeks injunctive relief. An exception to Eleventh Amendment immunity exists where a Plaintiff brings suit seeking prospective injunctive relief. However, as against a state agency like SUNY, the Eleventh Amendment is a bar regardless of "whether relief sought is legal or equitable," *Kulkarni v. City Univ. of N.Y.,* No. 01 CIV. 3019(DLC), 2001 WL 1415200, at *5 (S.D.N.Y. Nov.13, 2001). (quoting *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 *2d Cir.199)). Similarly, state law cannot provide a basis for injunctive relief. *Schwartz v. York College,* No. 06–CV–6754 (RRM) (LB), 2009 WL 3259379, at *3 (E.D.N.Y. Mar. 31, 2009) (denying injunctive relief for violations of NYHRL). The exception only applies where a plaintiff brings claims for prospective injunctive relief against state officials based on continuing violations of federal law. *Id* . (citing *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). In determining whether the exception "avoids an Eleventh Amendment bar to suit, a court need only

conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Jude v. New York State,* No. 07 Civ. 5890(RJS), 2009 WL 928134, at *4 (S.D.N.Y. Mar.30, 2009) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)) (alterations in original).

11. Here, Plaintiff seeks a court order that Defendants provide Plaintiff his first year credits, transfer him to another residency program, or provide further residency training in the program. Plaintiff contends that Defendants are required to provide him his first year credits and are continuing not to provide them. Thus, Plaintiff has pleaded an ongoing violation of federal law. Similarly, Plaintiff seeks prospective injunctive relief. Plaintiff asks this Court to order Defendants to stop withholding the credits he alleges to have rightfully earned. Alternatively, Plaintiff asks Defendants to provide him with additional training. Accordingly, this Court finds that Plaintiff's § 1981 claim for prospective injunctive relief against Defendants Saltzman and Rich would not be barred by the Eleventh Amendment.

**\*5** 12. Nevertheless, although the Eleventh Amendment does not bar Plaintiff's claims for injunctive relief, they are still barred by the statute of limitations. The statute of limitations under § 1981 is either three or four years, depending on whether the claims fall under the 1991 amendment to § 1981 or under its original construction. *See Ray v. Klyczek,* No. 08–CV–488S, 2009 WL 3199606, at *2 (discussing catchall four-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990). "Under federal law, a cause of action accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Nadolecki v. New York State Dep't of Taxation & Fin.,* No. CV 09–3888(SJF)(ETB), 2011 WL 2446491, at *10 (E.D.N.Y. May 17, 2011) (quoting *Peal v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002)). When considering whether a claim is timely, courts look to the time of the discriminatory act, not the point at which the consequences of the act become painful. *Id* . (quoting *Morse v. Univ. of Vt.,* 973 F.2d 122, 125 (2d Cir.1992)). Here, Plaintiff knew as early as the middle of 2005 that Defendants would not award Plaintiff all his residency credits for the first year. It is also undisputed that Plaintiff required a 12–month certificate of residency to receive his

medical license. Although Plaintiff was actually denied his medical license in 2009, it was clear that Defendants would not release Plaintiff's residency credits over four years earlier. Accordingly, because Plaintiff's claims accrued in 2005 they are time-barred.

13. Plaintiff's reliance on the continuing violation doctrine is misplaced. "Under the continuing violation doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Nadolecki,* 2011 WL 2446491, at *11 (quoting *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001)) (quotation marks omitted). The continuing violation doctrine is disfavored in this Circuit. *See Samimy v. Cornell Univ.,* 961 F.Supp. 489, 493 (W.D.N.Y.1997) (citing cases). Only compelling circumstances will warrant application of the continuing violation exception to the statute of limitations. *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (citing *LaBeach v. Nestle Co.,* 658 F.Supp. 676, 687 (S.D.N.Y.1987)). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) (citations omitted), *abrogated on other grounds by Kasten v. SaintGobain Performance Plastics Corp.,* ––– U.S. ––––, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011). Here, Plaintiff has not alleged the kind of discriminatory policies or mechanisms such as discriminatory seniority lists or employment tests that could qualify under the continuing violation exception. *See id.* Furthermore, the alleged acts in 2009 were merely a consequence of the decision Defendants made in 2005 to deny Plaintiff his residency credits for the full twelve months. Accordingly, the continuing violation doctrine is not applicable.

**\*6** 14. The Complaint also alleges violations of Title VII. Like Plaintiff's claims for injunctive relief, Plaintiff's Title VII claims are not barred by the Eleventh Amendment. *Nadolecki,* 2011 WL 2446491, at *5 ("Congress ha[s] expressed a clear intent to abrogate the states' Eleventh Amendment immunity under Title VII ...." (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976))); *see also Concey,* 2011 WL 4549386, at *14 (Title VII claims against New York State Unified Court System, Office of Court Administration not barred on Eleventh Amendment grounds). However, individuals

may not be held liable under Title VII. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–16 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). As a result, Plaintiff's Title VII claims against Defendants Saltzman and Rich will be dismissed.

15. Plaintiff's remaining Title VII discrimination and retaliation claims against SUNY are all time-barred. Before this Court can hear a Title VII claim, Plaintiff must first file a timely charge with the EEOC or equivalent state agency. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996); *Cornwell v. Robinson,* 23 F.3d 694, 706 (2d Cir.1994). In New York, where state and local agencies have authority to grant relief from unlawful employment practices, a discrimination claim must be filed with the state or local agency within 300 days after the alleged unlawful conduct. *Forsyth v. Fed'n Emp't & Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005) (citing 42 U.S.C. § 2000e–5(e)(1)), *abrogated on other grounds by Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007). Here, Plaintiff's Complaint reveals that he filed a claim with the EEOC in July 2006. The EEOC found that Plaintiff's claims were untimely. (Comp.¶ 29.) Although the Court notes that Plaintiff's Complaint alleges discriminatory action in April 2006, shortly before his EEOC filing, this is ultimately unavailing. A plaintiff bringing a Title VII action who has filed a timely charge with the EEOC must still file suit within 90 days of receipt of his right-to-sue letter. *Van Zant,* 80 F.3d at 712. Here, it is undisputed that Plaintiff did not file his Complaint within that 90 day period. Accordingly, Plaintiff's claims arising out of conduct occurring in 2005 and 2006 are time-barred.

16. Additionally, Plaintiff's claim for conduct occurring in August 2009 is also time-barred. Plaintiff claims that in August 2009, "Defendant Rich changed official letter denying any month credit resulting in no license could be issued for the plaintiff from the New York Medical License Unit" and also that "plaintiff's application for the physician scientist was rejected because of the said letter." (Comp.¶ 32.) As already discussed, a plaintiff must first exhaust his administrative remedies by presenting his claims to the EEOC. *Bailey v. Colgate–Palmolive Co.,* No. 99 Civ. 3228, 2003 WL 21108325, at *12 (S.D.N.Y. May 14, 2003). "[E]xhaustion of administrative remedies through the EEOC stands as an essential element of Title VII's statutory scheme, and one with which defendants are

entitled to insist that plaintiffs comply." *Boata v. Pfizer, Inc.,* No. 10 Civ. 4390(DLC), 2010 WL 4878872, at *4 (S.D.N.Y. Dec.1, 2010) (quoting *Francies v. City of New York,* 235 F.3d 763, 768 (2d Cir.2000)). Here, Plaintiff did not file a claim with the EEOC until October 2010 concerning conduct alleged to have occurred in August 2009. This takes it far outside the time period in which Plaintiff was required to file his charge with the EEOC. *See Parks v. New York City Dep't of Corr.,* 253 Fed. Appx. 141, 143 (2d Cir.2007) (noting that New York plaintiffs have 180 days from date of alleged unlawful employment practice to file complaint with EEOC where no proceedings instituted with relevant state or local agency). Accordingly, this claim must also be dismissed.

*7 17. The Court notes that on July 5, 2011, Plaintiff filed a response to Defendant's Reply Memorandum. In its March 16, 2011 scheduling notice, this Court directed that any response to Defendant's motion be made by March 31, 2011 and that Defendant's reply be filed by April 11, 2011. Plaintiff did not move, and this Court did not grant, leave to file a supplemental submission. Nevertheless, in deference to Plaintiff's status as a *pro se* litigant, this Court will consider Plaintiff's submission. Plaintiff's second response largely reiterates facts stated in his Complaint, as well as further arguing that this matter falls within the continuing violation doctrine, an argument this Court has already rejected. In that response, Plaintiff also states that he received a Dismissal and Notice of Rights from the EEOC on June 29, 2011, after Defendants had already filed their Reply. This confirms that, at the time Plaintiff filed his original Complaint on February 8, 2010, and his Amended Complaint on February 28, 2011, Plaintiff had not yet exhausted his administrative remedies. *Adams v. New York State Educ. Dep't,* 752 F.Supp.2d 420, 470 (S.D.N.Y.2010) ("A plaintiff cannot bring a Title VII claim in federal court until he has obtained a right to sue letter from the EEOC."). Moreover, based on the facts alleged in the Complaint, and as discussed above, Plaintiff's EEOC filing was untimely. Nothing in Plaintiff's second response compels a contrary result. Accordingly, Defendants' Motion to Dismiss will be granted as to Plaintiff's Title VII claims.

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 16) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5979162

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Heffernan v. U.S. Bank Nat. Ass'n,   S.D.Ohio,
July 10, 2014

2012 WL 1801740
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jennifer A. ZURENDA, Plaintiff,

v.

CARDIOLOGY ASSOCIATES, P.C., Defendant.

No. 3:10–CV–0882.
|
May 16, 2012.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

## I. INTRODUCTION

**\*1** Plaintiff commenced this action *pro se,*
asserting that she was discharged and harassed in
violation of the Americans with Disabilities Act
(the ADA) and New York State Human Rights Law
("NYHRL"). *See* Am. Compl. dkt. # 5. Defendant
moves for summary judgment pursuant to
Fed.R.Civ.P. 56, seeking to dismiss all of
Plaintiff's claims. *See* Motion, dkt. # 39. Plaintiff
opposes the motion by filing only an affidavit with
exhibits. *See* Response, dkt. # 41. Defendant filed
a reply to Plaintiff's opposition. *See* Reply, dkt. #
42. The motion is before the Court based on the
submissions alone, all of which the Court considers
in reaching its decision.

## II. STANDARD OF REVIEW

The Court may grant summary judgment where "there
is no genuine dispute as to any material fact and the
movant is entitled to a judgment as a matter of law."
FED. R. CIV. P. 56(a). A dispute is genuine if the
relevant evidence is such that a reasonable jury
could return a verdict for the nonmoving party.
*Anderson v. Liberty Lobby,* 477 U.S. 242, 248
(1986). A party seeking summary judgment bears the
burden of informing the court of the basis for the
motion and of identifying those portions of the
record that the moving party believes demonstrate
the absence of

a genuine issue of material fact as to a dispositive
issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323
(1986).

If the movant is able to establish a *prima facie*
basis for summary judgment, the burden of
production shifts to the party opposing summary
judgment who must produce evidence establishing
the existence of a factual dispute that a reasonable
jury could resolve in his favor. *Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587
(1986). The nonmoving party must show, by affidavits
or other evidence, admissible in form, that there are
specific factual issues that can only be resolved at
trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d
Cir.1995). "[P]roceeding *pro se* does not otherwise
relieve a litigant from the usual requirements of
summary judgment." *Viscusi v. Proctor & Gamble,*
2007 WL 2071546, at \* 9 (E.D.N.Y. July 16,
2007).

In determining whether to grant summary judgment,
the Court must view all facts in the light most
favorable to the nonmoving party, but "only if there
is a 'genuine' dispute as to those facts." *Scott v.
Harris,* 127 S.Ct. 1769, 1776 (2007). The nonmoving
party cannot defeat summary judgment by "simply
show [ing] that there is some metaphysical doubt as
to the material facts," *Matsushita., 475 U.S. at 586,*
or by a factual argument based on "conjecture or
surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d
Cir.1991). In this regard, a party opposing a
properly supported motion for summary judgment may
not rest upon "mere allegations or denials" asserted
in the pleadings, *Rexnord Holdings, Inc. v. Bidermann,*
21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory
allegations or unsubstantiated speculation. *Scotto v.
Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Hearsay
is also insufficient to create a question of fact on a
summary judgment motion. *See* Fed.R.Civ.P.
56(c)(4).

**\*2** The Local Rules of the Northern District
require a party moving for summary judgment to
submit a "Statement of Material Facts" which sets
forth, with citations to the record, each material fact
about which the moving party contends there exists
no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a
properly supported Local Rule 7.1(a)(3) Statement is
submitted, the party opposing the motion must

> file a response to the [movant's]
> Statement of Material Facts. The
> non-movant's response shall mirror
> the movant's Statement of Material

Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999) (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,*

289 F.Supp.2d 289, 295 (N.D.N.Y.2003); [1] *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004), application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan,* 289 F.Supp.2d at 295; *see also Faretta v. California,* 95 S.Ct. 2525, 2541 n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

[1]    To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295.

**\*3** Plaintiff's opposition to Defendant's motion consists merely of an affidavit accompanied by certain exhibits. *See* Response in Opposition [dkt. # 41]. She has submitted neither the required memorandum of law in opposition to Defendant's motion, nor the required response to Defendant's Statement of Material Facts. *See* N.D.N.Y.L.R. 7.1(a)(3). Because Plaintiff has not submitted an opposing Statement of Material Facts, the properly supported facts set forth in Defendant's STATEMENT OF MATERIAL FACTS NOT IN DISPUTE are deemed admitted for purposes of this motion. *See* N.D.N.Y.L.R. 7.1(a)(3).

### III. BACKGROUND [2]

[2]    Except where indicated otherwise, the facts are taken from Defendant's STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.

Plaintiff Jennifer A. Zurenda ("Plaintiff" or "Ms. Zurenda") began working for Defendant Cardiology Associates, P.C. ("Defendant" or "Cardiology Associates") on December 17, 2002 as a File Clerk/ Receptionist. Cardiology Associates is a New York professional corporation that provides cardiac medical services to patients in the Greater Binghamton area. It is governed by its Board of Directors, which consists of its ten partner physicians. Doctor Afzul Ur Rehman is the current president of the Board and Cathy Comeno is the clinical manager at Cardiology Associates.

As a File Clerk/Receptionist, Plaintiff was required to do filing, retrieve charts and records, and answer the telephone. Her position required her to both stand and sit throughout the day, and her filing responsibilities involved standing and bending regularly. Cathy Comeno reviewed Ms. Zurenda's performance as a File Clerk/Receptionist. Ms. Zurenda received mediocre performance reviews. These repeatedly noted that Plaintiff had the following problems: poor attendance; need for workflow improvement, need for improvement of morale; need for increased dependability; and need for increased written communication. Ms. Zurenda signed each of these reviews, and the reviews occurred before Ms. Zurenda left work for her first knee surgery (discussed *infra* ).

In 2006, Ms. Zurenda took a medical leave of absence from Cardiology Associates for a neck injury. That leave of absence lasted two to three months. Cardiology Associates accommodated Ms. Zurenda's neck injury by allowing her this leave, and she returned to work when it was over.

In 2007, Ms. Zurenda took a six-week medical leave of absence from Cardiology Associates for thyroid surgery. Cardiology Associates accommodated Ms. Zurenda's need for thyroid surgery by granting this leave, and she returned to work when it was over.

On February 1, 2008, after the resignation of another staff member, Ms. Zurenda was assigned to the position of Telephone Operator.[3] Ms. Zurenda's job duties as a Telephone Operator were essentially the same as a File Clerk/Receptionist with the additional duties of handling patient check-in and check-outs. During the time Ms. Zurenda was a Telephone Operator, Ellen Smith reviewed her performance. Ms. Zurenda's 2008 annual performance review noted that while she had improved in some areas she still needed to improve her productivity and "produce more work in a typical workday." This performance review was signed by Ms. Zurenda, Ellen Smith, and Cathy Comeno.

[3]    At first, the assignment was on a temporary basis, but in August 2008 she was permanently assigned to this position.

**\*4** In December 2008, Ms. Zurenda requested and received a medical leave of absence for surgery on her right knee. Ms. Zurenda was out of work for six weeks on this leave. She returned to work on February 2, 2009. Upon her return to work, Ms. Zurenda was allowed to work part time and park in the patient parking handicapped space. Plaintiff contends, however, that her part time schedule was not a reasonable accommodation for her because she had requested that she work in the mornings only so that she "could do physical therapy, chiropractor [*sic* ] and counseling in the afternoons." Am. Compl. ¶ 12. According to Plaintiff, she was scheduled to work two afternoons, one of which she agreed to work but one of which she did not because she did not have sufficient notice to reschedule her appointments. *Id.* ¶ 13. Plaintiff asserts that when she protested, she was told: "Either you work, or you don't have a job." *Id.* ¶ 14.

Plaintiff also contends that "[d]uring [this] time period, plaintiff was subjected to various demeaning comments regarding her condition by defendant's supervisor/ management, such as, 'I could come to work on crutches'[,] as well as comments from a doctor who would refer to the plaintiff as his 'big nigger'." *Id.* ¶ 15. Plaintiff asserts that she reported the doctor's racially derogatory remark to Ellen Smith but was told: "Just shrug it off, it's a joke." Pl. Aff. ¶ 5. Plaintiff also contends that she sought "some accommodation" for her leg, but was told by Ellen Smith to "pull out the desk drawer and put [her] foot on that, and that [she] only worked four hours, and that [she] could handle it." *Id.* ¶ 11. Plaintiff does not believe that putting her foot on the desk draw "is really an accommodation," *id.,* but she does not identify what accommodation she sought while at work or what accommodation she thought was reasonable.

Plaintiff also maintains that around this time she received an e-mail message asking her to fill in for others who could not work on two days. *Id.* ¶ 12. She responded to Cathy Comeno by saying that she could work on one of the days but not the other. *Id.* Plaintiff purportedly told Comeno that the reason she could not work on the one day was because "it was related to my health conditions, and disability," but Comeno told Plaintiff that she had to work on the date or she would be fired. *Id.*

On April 23, 2009, and because of a decline in income by Cardiology Associates as a result of reduced Medicare and insurance payments for certain procedures, Defendant's Board voted to lay-off staff.[4] After considering a number of possibilities for the staff reduction, the Board voted to make cuts from each of the employee groups.

Consequently, Cardiology Associates laid off one nurse practitioner, two nurses, and two staff members, including Ms. Zurenda. The people who were laid off were determined to be the least effective at doing their job in each employee group. This determination was made by the Board by majority vote. None of the office staff, including Cathy Comeno and Ellen Smith, participated in or had a say in the vote. Cardiology Associates paid severance for the professional employees (the nurses and nurse practitioner). They did not pay severance to Ms. Zurenda or to the other medical records clerk who was laid off. This decision was based solely on the classification of the employee. Plaintiff was told of the decision on the same day.

4    Cardiology Associates also took other cost cutting measures that are set forth in its STATEMENT OF MATERIAL FACTS NOT IN DISPUTE at ¶¶ 33–35, 46–48.

**\*5** Defendant asserts that at the time Ms. Zurenda was laid off, neither the Board members nor Ms. Comeno were aware that Ms. Zurenda had scheduled another right knee surgery in May 2009. Ms. Zurenda asserts, however, that "at the time they ended my employment, they knew I was set for more surgery on my right knee. Attached ... is a copy of a letter [dated April 13, 2009] regarding the surgery, a copy of which I provided to the defendant several days after I received it." Zurenda Aff. ¶ 10. Ms. Zurenda also asserts that she was told by someone at Cardiology Associates that she was "not eligible for disability [when she had her second knee surgery] because your are laid off." Am. Compl. ¶ 19.

Ms. Zurenda is not currently employed, has not been employed, and has been unable to work since leaving Cardiology Associates. She has not sent out any resumes or looked for any work since leaving Cardiology Associates, and her physicians have told her not to look for work because of her knee surgeries, back problems, depression and anxiety. Her physicians have never told her when she might be able to go back to work. Ms. Zurenda testified on November 8, 2011 that she has had five (5) knee surgeries in two (2) years and feels she has not been doing well since these surgeries. She testified that her father does her laundry because she cannot carry the basket or climb the stairs, and her mother cleans her house because the activities, including bending and standing, bother her back. She also needs assistance when she shops. In addition to her knee problems, Ms. Zurenda believes she has been diagnosed as bipolar or schizophrenic and that it affects her ability to be around people and work.

Ms. Zurenda has applied for Social Security Disability on two occasions, and has applied for and received short-term disability after leaving Cardiology Associates. Ms. Zurenda applied for unemployment insurance benefits, but was unable to receive these benefits because she was unable to work.

On April 23, 2009, Ms. Zurenda's orthopedic surgeon, Dr. Battaglia, noted in her chart that she was totally disabled until further notice or her next office visit. Dr. Battaglia has made that same notation on each of Ms. Zurenda's visits since that date.

After Ms. Zurenda's termination, she filed a complaint with the New York State Division of Human Rights ("DHR") that was dually filed with the Equal Employment Opportunities Commission ("EEOC"). She later amended her DHR complaint. The DHR complaint, as amended, asserts the claims asserted in this action. After investigation, the DHR determined that there was no probable cause to believe discrimination had occurred. After receiving the DHR's determination, Ms. Zurenda did not appeal it in state court but instead commenced the instant action.

## IV. DISCUSSION

### a. NYSDHR Claims

To the extent that Plaintiff asserts claims under the New York State Human Rights Law ("NYSHRL") based upon conduct complained of to the New York Division of Human Rights, those claims are barred by the NYSHRL's election of remedies provision contained at New York Executive Law § 297(9). This provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction ... unless such person had filed a complaint hereunder." N.Y. Exec. Law § 297(9). "[New York Executive Law § 297(9) ] deprives federal courts of subject matter jurisdiction where a plaintiff previously elected to proceed in an administrative forum." Chudnovsky v. Prudential Sec., Inc., 2000 WL 1576876, at \*4 (S.D.N.Y. Oct. 23, 2000). Thus, "[o]nce a complainant elects the administrative forum by filing a complaint with the Commission on Human Rights, that becomes the sole avenue of relief, and subsequent judicial action on the

same complaint is generally barred ...." *Moodie v. Fed. Reserve Bank of N.Y.,* 58 F.3d 879, 884 (2d Cir.1995). [5] "Furthermore, once a plaintiff brings a case before the NYSDHR, he or she may appeal only to the Supreme Court of the State of New York ." *York v. Ass'n of Bar of City of New York,* 286 F.3d 122, 127 (2d Cir.2002) (citing N.Y. Exec. Law § 298).

[5]    The exception to this rule is a dismissal for administrative convenience made before the administrative agency renders a decision on the complaint.

**\*6** Because Plaintiff's Division of Human Rights complaint was dismissed based on a finding of "no probable cause," the Court lacks subject matter jurisdiction to consider NYSHRL claims based on the same acts raised with the Division. *Jones v. Onondaga County Res. Recovery Agency,* 2011 WL 1298774, \*6 (N.D.N.Y. Mar. 31, 2011); *DeWald v. Amsterdam Housing Authority,* 823 F.Supp. 94, 99 (N.D.N.Y.1993). Accordingly, all NYSHRL claims asserted in this matter are dismissed.

### b. Disparate Treatment Claim Under the ADA

Plaintiff brings a disparate treatment claim under the ADA, asserting that she was discharged because of her disabilities. The ADA prohibits discrimination against a "qualified individual [with a disability] on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims alleging discriminatory discharge under the ADA are analyzed using the burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n. 1 (2d Cir.2000) (ADA claims are evaluated under *McDonnell Douglas); Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999). Under this analysis, Plaintiff first bears the burden of setting out a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802. Plaintiff's burden of establishing a *prima facie* case is *de minimis. Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008). If the plaintiff demonstrates a *prima facie* case, that gives rise to a presumption of unlawful discrimination and the burden of production shifts to the defendant who is required to offer a legitimate, nondiscriminatory rationale for its actions. *See McDonnell Douglas,* 411 U.S. at 802–03. Defendant's

burden of production at this stage "is not a demanding one," *Bickerstaff v. Vassar College,* 196 F.3d 435, 446 (2d Cir.1999), it need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993).

If Defendant proffers a legitimate, nondiscriminatory reason for the challenged action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's Honor Ctr.,* 509 U.S. at 507. The burden shifts back to Plaintiff who "then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that [unlawful retaliation] was." *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc* ) (internal citation and quotation marks omitted), *cert. denied,* 522 U.S. 1075 (1998); *see Stern v. Trustees of Columbia Univ. in the City of N.Y.,* 131 F.3d 305, 312 (2d Cir.1997) (In order to defeat summary judgment ..., the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."). The ultimate burden of persuasion remains always with Plaintiff. *St. Mary's Honor Ctr.,* 509 U.S. at 507, 511. In determining whether Plaintiff can satisfy this ultimate burden, the Court must examine the entire record and apply "a case-by-case approach." *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000).

**\*7** To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show that: (1) her employer is subject to the ADA, (2) she is disabled within the meaning of the ADA, (3) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation, and (4) she was discharged because of her disability. *See Jacques v. DiMarzio, Inc.,* 386 F .3d 192, 198 (2d Cir.2004). The second, third, and fourth elements, as well as the ultimate question of discrimination, are in dispute on this motion.

### (1) Disabled within the meaning of the ADA

On the second element of the *prima facie* case, Plaintiff must present evidence demonstrating that she is disabled within the meaning of the ADA. The ADA defines disability with respect to an individual as: "(A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Buckley v. Consol. Edison Co. of N.Y.,* 127 F.3d 270, 272 (2d Cir.1997). "[T]he determination of whether or not a person suffers from a disability under the ADA 'is an individualized inquiry' that does not rest on the mere diagnosis of an impairment." *Bonilla v.. Boces,* 2010 WL 3488712, at \*5 (W.D.N.Y. Sept. 2, 2010) (citing *Sutton v. United Airlines,* 527 U.S. 471, 483 (1999)). Instead, courts are to look to "the effect of [an] impairment on the life of the individual," 29 CFR pt. 1630, App. § 1630.2(j), and "[i]t is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of impairment." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 198 (2002). Regulations promulgated under the ADA define "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I); *see also Buckley v. Consolidated Edison Co. of New York, Inc.,* 155 F.3d 150 (2d Cir.1998) (*en banc* ).

To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota,* 534 U.S. at 197. "The need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA." *Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 152 (2d Cir.1998).

Plaintiff asserts that she was disabled from the major life activity of working. An impairment "substantially limits" the major life activity of working if an individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

**\*8** At the time Plaintiff was discharged for her employment, she was recovering from a knee surgery but was working on a part time basis. Although it appears that her mobility was limited and she feels that she was not provided some unidentified accommodation at work and the part time schedule she wanted, the evidence does not indicate that, at the time, she was disabled from the major life activity of working. Plaintiff argues, however, that she was scheduled for a second right knee surgery at the time, and seemingly asserts that this upcoming surgery would prevent her from working while she recovered thereby qualifying as a disability under the ADA. This is insufficient.

"A disability under the ADA 'does not include temporary medical conditions, even if those conditions require extended leaves of absence from work' because such conditions are not substantially limiting." *Huskins v. Pepsi Cola of Odgensburg Bottlers, Inc.,* 180 F.Supp.2d 347, 351–52 (N.D.N.Y.2001) (quoting *Halperin v. Abacus Technology Corporation,* 128 F.3d 191, 199 (4th Cir.1997)). "Courts within this circuit and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary disabilities are not disabled persons within the meaning of the act." *Graaf v. North Shore University Hospital,* 1 F.Supp.2d 318, 321 (S.D.N.Y.1998); *see also Adams v. Citizens Advice Bureau,* 187 F.3d 315, 316–17 (2d Cir .1999) (temporary neck, back, and knee injury lasting three and a half months not a disability); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998) (temporary impairment of seven months inability to work while recovering from a cerebral hemorrhage not substantially limiting); *Murray v. Svsco Corp.,* 1998 WL 160826, at \*8 (N.D.N.Y. Apr. 2, 1998) (holding that a knee injury requiring surgery did not have the required duration or long-term impact to qualify as a disability under the terms of the ADA). Thus, Plaintiff has not presented evidence that, at the time of her employment, she suffered from or had a record of an impairment that qualified as a disability under the ADA.

Further, and assuming the decision maker at Cardiology Associates was aware of Plaintiff's upcoming second right knee surgery, Plaintiff has not presented evidence that would satisfy even the new, more lenient standard for determining whether an individual is "regarded as disabled." *See Laurent v. G & G Bus Service, Inc.,* 2011 WL 2683201, at \*5–\*6 (S.D.N.Y. May 17, 2011).[6]

6

[T]he ADA was recently amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110–325, 122 Stat. 3553 (2008). The ADAAA sets forth a new standard for determining whether a person is "regarded as having such an impairment":

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

Laurent v. G & G Bus Service, Inc., 2011 WL 2683201, at *5–*6 (S.D.N.Y.2011), adopted by 2011 WL 2693651 (S.D.N.Y. July 11, 2011).

Pursuant to this more lenient standard, an employee is "not required to show that the disability [s]he is perceived as suffering from is one that actually limits, or is perceived to limit, a major life activity." Darcy v. City of New York, No. 06–CV–2246, 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011). Nor does the employee have to "show that the employer had a reasonable basis for perceiving [her] as suffering from a disability; [the statute] merely requires [her] to show that the employer did so perceive [her]." Id.

**\*9** Davis v. NYC Dept. of Educ., 10–CV–3812 KAM LB, 2012 WL 139255, at *5 (E.D.N.Y. Jan. 18, 2012).

The ADAA specifies, however, that the "regarded as" definition of disability does not apply to impairments that are both transitory and minor. 42 U.S.C. § 12102(3)(B); see also 29 C.F.R. § 1630.15(f) (2011) ("It may be a defense to a charge of discrimination by an individual claiming coverage under the "regarded as" prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) 'transitory and minor.' "). An impairment is transitory if it has "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). "Whether the impairment at issue is or would be 'transitory and minor' is to be determined objectively." 29 C.F.R. § 1630.15(f) (2011).

Id.

While the evidence indicates that after Ms. Zurenda was discharged she suffered from a combination of conditions completely limiting her ability to work (discussed *infra*), Plaintiff has presented no basis on which to conclude that anyone at Cardiology Associates was, or could have been, aware that these developments would ensue. Based on Plaintiff's history of physical aliments and surgeries requiring leaves from work of between six (6) and twelve (12) weeks, which includes her first knee surgery, the evidence indicates, when objectively viewed at the time of the employment decision in question, that Plaintiff has presented evidence indicating only that she was regarded as having an impairment that was transitory and minor in nature. Accordingly, Plaintiff has not satisfied the second element of her *prima facie* case.

### (2) Otherwise qualified to perform the essential functions of her job

Assuming, *arguendo*, that Plaintiff could satisfy the second element of her *prima facie* case, she must also present evidence demonstrating that she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation. "It is axiomatic that an individual cannot perform the essential functions of a job if [s]he is completely unable to work regardless of accommodation." Henzel v. Delaware Otsego Corp., 285 F.Supp.2d 271, 276 (N.D.N.Y.2003) (collecting cases); see also Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 8 (2d Cir.1999) ("[O]nce estopped from arguing he could walk and stand and therefore bound to the assertion that he could only do sedentary work, [Plaintiff] could not show that he could perform the essential functions of Head Custodian with a reasonable accommodation. He therefore failed to make out a claim under the ADA."). The undisputed evidence in this matter indicates that Plaintiff has been totally disabled from employment since her physician excused her from work on April 23, 2009. Her physicians have not cleared her to return to work, even on a part time basis. See Pl. Dep. Trans., p. 7. Plaintiff testified that she has not been able to work since that date because of her knee surgeries, back problems, depression and anxiety. Id. Further, Plaintiff has neither looked for work nor sent out any resumes since April 23, 2009, and has twice applied to receive disability benefits from the Social Security Administration because of her inability to work. Id. pp. 6, 9–10. In light of these facts, Plaintiff is unable to satisfy the third element of her *prima facie* case.

### (3) Discharged motivated by disability

**\*10** Nevertheless, and assuming that Plaintiff could establish that she was disabled within the meaning of the ADA and otherwise qualified to perform her former position either with or without a reasonable accommodation, she must establish that consideration of her disability was a motivating factor in the discharge determination. Crediting her contention that she was discharged because she was about to undergo another right knee surgery, and thus assuming she could satisfy the fourth element of her *prima facie* case on the theory that she was discharged because of the circumstances related to her physical condition, the employer has stated a legitimate, non-discriminatory reason for her (and three other individuals') discharge. Namely, the uncontradicted evidence indicates that in the face of an economic downturn, Defendant determined, *inter alia,* to lay off the four least productive employees in each of three employment classifications, and that Plaintiff was one of two employees in her employment classification who was laid off.

Thus, the burden is shifted back to Plaintiff to demonstrate that the employer's stated reason is not the true reason for her discharge or that a discriminatory motive was involved in the decision. She has not satisfied this burden. Plaintiff has presented insufficient evidence from which a reasonable fact finder could conclude that consideration of her physical condition motivated the discharge determination. Plaintiff has not demonstrated that her prior work performance exempted her from layoff based upon the employer's legitimate businesses-related criteria, or that similarly situated non-disabled employees were treated differently than she was treated.

Plaintiff argues that evidence of discrimination is shown by the fact that Cardiology Associates hired an individual in August 2009 who performed some of the functions that Plaintiff used to perform when her coworkers were on their lunch breaks. However, even if Cardiology Associates filled Ms. Zurenda's position in August 2009, almost 4 months after Plaintiff's discharge, Plaintiff has not demonstrated that this act is indicative of discrimination. While the filling of a position by someone outside of a protected classification can provide some evidence of a discriminatory motive, here there is no evidence that Plaintiff applied for reinstatement or that she could have performed the functions of the position in August 2009. Indeed, the evidence is to the contrary, indicating that her physician deemed her unable to work

in any capacity from April 2009 to the present. At most, Plaintiff's claim of ADA disparate treatment is based upon her own feelings and perception of being discriminated against, but such "feelings and perceptions of being discriminated against are not evidence of discrimination."

*Bickerstaff,* 196 F.3d at 446; *see id.* at 448;[7] *Richardson v. New York State Dep't, of Correctional Service,* 180 F.3d 426, 447 (2d Cir.1999).[8] Plaintiff has failed to provide sufficient evidence from which a reasonable fact finder could conclude that considerations of her medical condition motivated the employer's layoff determination.

[7]    As indicated in *Bickerstaff,* on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances. *Bickerstaff,* 196 F.3d at 448 (internal quotation marks and citations omitted).

[8]    (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual)

**\*11** For the reasons discussed above, Plaintiff's ADA disparate treatment claim is dismissed.

### b. ADA Hostile Work Environment Claim

Plaintiff also alleges a claim of hostile work environment under the ADA. To establish a claim of hostile work environment under the ADA,[9] a plaintiff must prove that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Clark County School District v. Breeden,* 532 U.S. 268, 270 (2001); *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993); *Quinn v. Green Tree Credit Corp.,* 159 F .3d 759 (2d Cir.1998); *see Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 208 (E.D.N.Y.1997) (analyzing ADA hostile work

environment claim under the same standard utilized in Title VII cases). A "hostile work environment claim will succeed only where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or abusive work environment,' and where the victim 'subjectively perceive[s] the environment to be abusive.' " *Richardson v. N.Y. State Dep't. of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Harris,* 510 U.S. at 21–22). The objective aspect of this test is judged by a reasonable person standard. *Id* . To analyze a hostile work environment claim, the Court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Gorzynski v. Jetblue Airways Corp.,* 596 F .3d 93, 102 (2d Cir.2010) (quoting *Harris,* 510 U.S. at 23).

9    The Court assumes, *arguendo,* that the Second Circuit recognizes a hostile work environment cause of action under the ADA. *See, e.g., Braun v. Securities Sec. Services USA. Inc.,* 2009 W L 150937, *8 (E.D.N.Y. January 20, 2009)* ("Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environment, *see Bonura v. Sears Roebuck & Co.,* 62 F. App'x 399, 400 n. 3 (2d Cir.2003), several district courts in this circuit have held that such claims are cognizable. *See, e.g., Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 208 (E.D.N.Y.1997) (analyzing ADA hostile work environment claim under the same standard utilized in Title VII cases); *Hudson v. Loretex Corp.,* 1997 WL 159282, at *2–3 (same).").

The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. *Brennan v. Metropolitan Opera Assn, Inc.,* 192 F.3d 310, 318 (2d Cir.1999) (citing *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992)). "Generally,

unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Gorzynski,* 596 F.3d at 102 (quoting *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002)); *see also Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 547 (2d Cir.2010) ("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe."); *Alfano,* 294 F.3d at 376 ("the twelve incidents cited by [plaintiff], taken together, [we]re insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment"); *Williams v. Cnty. of Westchester,* 171 F.3d 98, 100 (2d Cir.1999) (plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice) (quotation marks and citation omitted).

**\*12** Plaintiff's hostile work environment claims rest upon allegations that on a few occasions she had to work when she did not want to and a few isolated comments she found objectionable, some of which are not related to her asserted disability but rather have derogatory racial or ethnic connotations. Even considering the events in totality, including the non-disability related comments for the impact they had on the atmosphere in the office, Plaintiff has not demonstrated sufficiently pervasive and severe harassment such to create an actionable hostile work environment. Therefore, Plaintiff's ADA hostile work environment claim is dismissed.

## V. CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [dkt. # 39] is **GRANTED** and Plaintiff's claims are **DISMISSED** in their entirety.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1801740, 26 A.D. Cases 834

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

2013 WL 998040
United States District Court,
N.D. New York.

Corbet D'ENTREMONT, Plaintiff,

v.

ATLAS HEALTH CARE LINEN SERVICES,
CO., LLC; Scott Wakeman, sued individually
and as as an employee of Atlas; and Jane
Doe, Quality Control Manager for Atlas, sued
individually and as agent for Atlas, Defendants.

No. 1:12–CV–0060 (LEK/RFT).
|
March 13, 2013.

**Attorneys and Law Firms**

Corbet D'Entremont, Collins, NY, pro se.

Christopher J. Harrigan, Kevin M. Hayden, Hiscock,
Barclay Law Firm, Syracuse, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

## I. INTRODUCTION

**\*1** On January 12, 2012, *pro se* Plaintiff Corbet
D'Entremont ("Plaintiff") filed a Complaint against
Defendants Atlas Health Care Linen Services, Co.,
LLC ("Atlas"), Scott Wakeman, and a single Jane Doe
Defendant ("Doe" or "the Doe Defendant") identified
as a "Quality Control Manager for Atlas" (collectively,
"Defendants"). Dkt. No. 1 ("Complaint"). Plaintiff
asserts federal claims under the Americans with
Disabilities Act ("ADA") and § 510 of the Employment
Retirement Income Security Act of 1974 ("ERISA"). *Id.*
On January 12, 2012, Plaintiff also filed a Motion for leave
to proceed *in forma pauperis,* which was subsequently
granted by the Honorable Randolph F. Treece, United
States Magistrate Judge. Dkt. Nos. 2, 7.

Following a number of extension requests by Defendants,
which were granted by Judge Treece, [1] Defendants filed a
Motion to dismiss the Complaint in its entirety pursuant
to Rule 12(b)(6) of the Federal Rules of Civil Procedure on

April 30, 2012. [2] Dkt. No. 25 ("Defendants' Motion"). On
May 23, 2012, Plaintiff filed a Response in opposition to
Defendants' Motion. Dkt. No. 31 ("Plaintiff's Response").
Defendants, in turn, filed a Reply on June 4, 2012. Dkt.
No. 32 ("Defendants' Reply").

[1]     *See generally* Dkt.

[2]     Defendants also move to dismiss the pendent state law
        claims under Rule 12(b)(1) in the event that the Court
        dismisses the federal claims under Rule 12(b)(6).

On June 13, 2012, Plaintiff filed a Motion to amend
his Complaint to name the Doe Defendant and "fix any
deficiencies the court may find." Dkt. No. 37 ("Plaintiff's
Motion"). On June 28, 2012, Defendants filed a Response
in opposition. Dkt. No. 38 ("Defendants' Response").
Plaintiff, in turn, filed a Reply on July 13, 2012. Dkt. No.
39 ("Plaintiff's Reply"). Presently before the Court are
Defendants' Motion to dismiss and Plaintiff's Motion to
amend

## II. BACKGROUND
The Court presumes the parties' familiarity with the
factual allegations underlying this action and recites them
here only to the extent necessary to resolve the instant
Motions. For a more complete statement of the facts,
reference is made to the Complaint.

On January 14, 2011, Plaintiff began work for Atlas as a
laundry sorter. Compl. ¶¶ 8–9. Plaintiff was given papers
to sign by Doe, who also informed Plaintiff that he was
on a 90–day probation period with Atlas, after which
he would be able to join the union, as well as Atlas's
medical, dental, and life insurance plans. *Id.* ¶¶ 9, 11. On
his first day of work, Plaintiff worked from approximately
7:00 AM until 7:30 PM. *Id.* ¶ 12. He was assigned to the
"clean side" of the factory, where his job duties included
folding clean linen and placing it into designated carts. *Id.*
Following his first day of work, Plaintiff experienced no
back pain. *Id.*

The following day, after starting work on the clean side of
the factory, Plaintiff was transferred to the "dirty side,"
where his job responsibilities involved unloading dirty
laundry from trucks, carrying crates, and sorting and
lifting bags of dirty laundry. *Id.* ¶¶ 16–17. By the end of
the day, Plaintiff was experiencing slight pain in his lower
back.

**\*2** On January 16, 2011, Plaintiff reported for work wearing a back brace that had been provided to him by a physician. *Id.* ¶ 20. Plaintiff once again worked on the dirty side of the factory. *Id* . ¶¶ 9, 11. After lunch, Plaintiff spoke with his supervisor and told his supervisor—when asked— that he preferred working on the clean side of the factory because of his back problems.[3] *Id.* ¶ 23. The supervisor said that he would try to have Plaintiff reassigned to the clean side. *Id.* That night, Plaintiff experienced significant lower back pain. *Id.* ¶ 26.

[3]      Plaintiff also told his supervisor that he was wearing a back brace. *Id.* ¶ 23.

The following day, January 17, 2011, Plaintiff was experiencing excruciating back pain and went to St. Mary's Hospital instead of reporting for work. *Id.* ¶¶ 27– 29. There, he was given a doctor's note "keeping him out of work for three days." *Id.* ¶ 30. While he had not informed Atlas of his absence in advance or on the day of his trip to the hospital, Plaintiff called Atlas's "absentee hotline" at 12:00 A.M. on January 18, 2011, and left a message explaining the situation (including the existence of the doctor's note). *Id.* ¶¶ 30–35. Plaintiff did not attend work the next day, and left another message on the absentee hotline explaining that he would be missing work on January 20 for a doctor's appointment. *Id.* ¶¶ 37–38.

After meeting with his back specialist, Dr. Whalen, on January 20, 2011, Plaintiff left yet another message with Atlas, this time stating that Dr. Whalen was keeping him out of work for the next seven days and asking that someone from Atlas call him to discuss the situation.[4] *Id.* ¶ 42. On January 21, 2011, Plaintiff brought his doctor's note to the Atlas building and rang the door bell, but no one responded.[5] *Id.* ¶ 43. Plaintiff left another voice message explaining that he had tried to drop off the doctor's note and stating that he would be out of work until January 26, 2011. *Id.* ¶ 45.

[4]      Dr. Whalen also told Plaintiff that when he returned to work, he could not lift more than ten pounds. *Id.* ¶ 41.

[5]      From the Complaint, it is unclear whether the building Plaintiff visited on January 21, 2011 is the same as the "factory" to which he had previously reported for work.

On January 26, 2011, Plaintiff finally returned to Atlas. *Id.* ¶ 47. He gave both of his doctor's notes to Doe and told her about his back injury and explained that he had called in to report his absences after the first day. *Id.* ¶¶ 47– 49. Plaintiff told her that he had discussed the possibility of filing a worker's compensation claim against Atlas with Dr. Whalen, but that they had determined that Plaintiff should not because his back pain was an aggravation of a previous injury. *Id.* ¶ 51. At this point, Doe asked how long Plaintiff had worked for Atlas. *Id* . ¶ 52. Plaintiff replied "three days," Doe looked over Plaintiff's doctors' notes one more time, and told him, "[U]nfortunately, we let you go." *Id.* ¶¶ 53–54.

Plaintiff claims that Defendants knew he was serving a court-ordered sentence of probation at the time of his employment because he had stated it on his job application form. *Id.* ¶¶ 57–59. Following his firing, Plaintiff was charged with violating the terms of his probation in part due to his not having gainful employment. *Id.* Plaintiff was sentenced to three years' incarceration and post release probation due to his violation. *Id.* ¶ 60.

**\*3** Plaintiff pursued state administrative remedies against Atlas for discrimination and, on October 17, 2011, received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶¶ 50–63. The instant suit followed.

## III. LEGAL STANDARDS

### A. Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also* FED. R. CIV. P. 12(b) (6). Such a determination "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (citation omitted). A court must accept as true the factual allegations contained in the complaint and draw all inferences in favor of the plaintiff. *See Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that he or she is entitled to relief and the action is subject to dismissal. *See Iqbal,* 556 U.S. at 678–79.

Additionally, the allegations of a *pro se* litigant are to be construed under a "less stringent standard[ ] than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009).

**B. Leave to Amend the Complaint**

Rule 15 of the Federal Rules of Civil Procedure states that "a party may amend its pleading only with the opposing party's written consent or the court's leave[,] ... [but that t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). As noted, the allegations of a *pro se* litigant are to be construed under a "less stringent standard[ ] than formal pleadings drafted by lawyers." *Haines,* 404 U.S. at 520–21; *see also Harris,* 572 F.3d at 72. "A *pro se* plaintiff, particularly one bringing a civil rights action, should be afforded an opportunity fairly freely to amend his complaint." *Holmes v. Goldin,* 615 F.2d 83, 85 (2d Cir.1980); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the

complaint gives any indication that a valid claim might be stated.").

**\*4** Additionally, " '[t]he party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial.' " *Gorham–DiMaggio v. Countrywide Home Loans, Inc.,* No. 1:08–CV–019, 2009 WL 1748743, at *3 (N.D.N.Y. June 19, 2009) (quoting *New York v. Panex Indus., Inc.,* No. 94–CV–0400, 1997 WL 128369, at *2 (W.D.N.Y. Mar. 14, 1997)). A district court is afforded broad discretionary power in granting leave to amend pleadings. *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998). However, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). Where "futility is an appropriate basis for denying leave to amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to [Rule 12(b) (6) ]." *Gorham–DiMaggio,* 2009 WL 1748743, at *3.

To be granted leave to amend a complaint that names a new party, Plaintiff must name a "new party [who must] be deemed to relate back to the original timely complaint." *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 128 (2d Cir.2001). Further,

> [t]here are ... three requirements that must be met before an amended complaint that names a new party can be deemed to relate back to the original timely complaint. First, both complaints must arise out of the same conduct, transaction, or occurrence. Second, the additional defendant must have been omitted from the original complaint by mistake. Third, the additional defendant must not be prejudiced by the delay.

*Id.* (citing *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35–36 (2d Cir.1996)). The goal of these "relation back" principles outlined by the Second Circuit and drawn from Rule 15(c) of the Federal Rules of Civil Procedure is "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations

defense." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 19 (2d Cir.1997) (quoting FED. R. CIV. P. 15 Advisory Committee Note (1991)) (internal quotation marks omitted); *see also VKK Corp.,* 244 F.3d at 128.

## IV. DISCUSSION

### A. Defendants' Motion

As a preliminary matter, the Court notes that Plaintiff contends that Defendants' Motion is untimely. Plaintiff claims that he was unaware of any extensions granted to Defendants. A review of the docket, however, reveals that Judge Treece granted several requests by Defendants for extensions of time to respond to Plaintiff's Complaint. Dkt. Nos. 17, 20; Text Order dated April 20, 2011. In light of Plaintiff's *pro se* status, and in the interests of preventing continued confusion, the Court orders the Clerk of the Court to provide Plaintiff with a copy of the docket in this matter.

**\*5** Next, the Court notes that the parties have submitted supplemental materials. Where both parties submit supplemental materials not contained in the pleadings, and those materials are not excluded by the court, the motion to dismiss "must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d); *see also Rotter v. Leahy,* 93 F.Supp.2d 487, 493 (S.D.N.Y.2000). The Court declines to consider these supplemental materials and therefore treats Defendants' Motion as a motion to dismiss. Accordingly, the Court addresses Defendants' arguments in turn, addressing the sufficiency of Plaintiff's pleadings.

### 1. ADA Claim

Before addressing the broader claim against Atlas, the Court concludes that Plaintiff's ADA claim against Defendant Wakeman suffers from a fatal flaw. A defendant may not be held individually liable under Title I of the ADA. *See, e.g., Carlson v. Geneva City Sch. Dist.,* 679 F.Supp.2d 355, 378 (W.D.N.Y.2010) (stating that actions against defendants in their individual capacities are not permitted under Title I of the ADA); *Fox v. State Univ. of N.Y .,* 497 F.Supp.2d 446, 449 (E.D.N.Y.2007) (same) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Because this is a legal defect in Plaintiff's claim that could not be remedied by better pleadings, the Court dismisses Plaintiff's ADA claim against Defendant Wakeman with prejudice. [6] *Foman,* 371 U.S. at 182.

[6]      For the same reasons, the Court dismisses Plaintiff's ADA claim against Defendant Jane Doe with prejudice.

"The ADA prohibits discrimination against a 'qualified individual on the basis of disability' in the 'terms, conditions, and privileges of employment.' " *Kinneary v. City of New York,* 601 F.3d 151, 155 (2d Cir.2010) (quoting 42 U.S.C. § 12112(a)). To establish a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must show that: "(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998) (citing *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994); *Bates v. Long Island R.R .,* 997 F.2d 1028, 1035 (2d Cir.1993)).

Courts analyzing discrimination claims under the ADA apply the three-step burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972); *McBride v. BIC Consumer Products Mfg. Co., Inc.,* 583 F.3d 92, 96 (2d Cir.2006) At the first stage, the burden of production rests with the plaintiff to make out a *prima facie* case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446 (2d Cir.1999). This initial burden is not a heavy one. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001); *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001). After the plaintiff has made a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas,* 411 U.S. 792 at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. If the defendant is able to make such a showing, the burden shifts back to the plaintiff to "produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *McBride,* 583 F.3d at 96.

**\*6** To survive a motion to dismiss, however, "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a *prima facie* case of discrimination under the framework set forth

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

in *McDonnell Douglas Corp." Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Boykin v. KeyCorp,* 521 F.3d 202, 212 (2d Cir.2008); *Barbosa v. Continuum Health Partners, Inc.,* 716 F.Supp.2d 210, 215 (S.D.N.Y.2010). "[T]he *McDonnell Douglas* burden-shifting framework 'is an evidentiary standard, not a pleading requirement." *Boykin,* 521 F.3d at 212 (internal quotation marks omitted). The elements of a *prima facie* case do, however, "provide an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." *Sommersett v. City of New York,* No. 09 Civ. 5916, 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011). Courts therefore "consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the grounds on which it rests." *Murphy v. Suffolk Cnty. Cmty. Coll.,* No. 10 Civ. 0251, 2011 WL 5976082, at *5 (E.D.N.Y. Nov.29, 2011).

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). For an individual to be "regarded as having an impairment" under 42 U.S.C. § 12102(1)(C), the individual must establish "that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). However, paragraph (1)(C) "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." [7] *Id.* § 12102(3)(B).

[7] *See also Kennebrew v. N.Y.C. Hous. Auth.,* No. 01 CIV 1654, 2002 WL 265120, at *18 n. 32 (S.D.N.Y. Feb.26, 2002) ("[T]emporary, non-chronic impairments of short-duration, with little or no long term or permanent impact, are usually not disabilities.").

Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which expanded the class of individuals entitled to protection under the ADA. [8] "Following the amendments, major life activities no longer need to be of 'central importance,' and may include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.' " *Sam–Sekur v. Whitmore Group, Ltd.,* No. 11–CV–4938, 2012 WL 2244325, at *6 (E .D.N.Y. June 15, 2012) (quoting 42 U.S.C. § 12102(2)(A)).

[8] The Ninth Circuit has stated that:
> In the ADAAA, Congress emphasizes that when it enacted the ADA in 1990, it "intended the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide broad coverage." The ADAAA rejects the Supreme Court's interpretation of the term "disability" in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), and thereby expands the class of individuals who are entitled to protection under the ADA.
>
> *Rohr v. Salt River Project Agric. Improvement & Power Dist.,* 555 F.3d 850, 853 (9th Cir.2009) (citations omitted).

In this case, Plaintiff alleges that he has back problems and that Atlas terminated his employment as a result of his health issues. *See generally* Compl. ¶¶ 64–70. Liberally construed, his Complaint alleges that: (1) Atlas is subject to the regulations of the ADA; (2) Plaintiff was physically able to perform the job duties associated with the clean side of the Atlas factory; (3) Plaintiff suffered from a chronic back problem that was aggravated by the heavy lifting he had to perform on the dirty side of the Atlas factory; (4) Atlas found out about this disability through his phone messages and ultimately through his doctors' notes; and (5) Doe ultimately fired him because he was disabled. *See generally id.*

*7 Defendants contend, however, that Plaintiff's ADA claim is deficient because: (1) Plaintiff has failed to allege that he was disabled under the language of the ADA; (2) Plaintiff has made no assertion that Atlas provided preferential treatment to non-disabled employees; and (3) Atlas had no notice of Plaintiff's alleged disability. *See generally* Def.'s Mot. at 6–10. Defendants' argument is essentially that Plaintiff was fired immediately upon his failure to report to work on January 17, 2011, for violating the attendance policy for probationary employees and that—even if Plaintiff's back injury amounted to a

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

disability, and even if Defendants were eventually placed on notice—Defendants were not on notice of the disability until January 18, 2011. *See generally id* .

Mindful of Plaintiff's *pro se* status and of the Second Circuit's admonition that a plaintiff's burden of establishing a *prima facie* case at the initial *McDonnell Douglas* pleading stage "is neither onerous nor intended to be rigid, mechanized or ritualistic," *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001) (internal citations and quotation marks omitted), the Court denies Defendants' Motion to dismiss as to the ADA claim. Plaintiff's *prima facie* case may be lacking in great detail as to the specifics of his disability, his description of his ability to perform the essential functions of his job may be sparse, and his recitation of causation may not be unassailable, but the Court concludes that his pleadings "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Further, given Plaintiff's detailed account of his brief employment, his interaction with physicians, and his ultimate encounter with Doe, the Court concludes that the Complaint provides Defendants with sufficient notice as to the nature of the claim.

*2. ERISA Claim*
As pleaded, Plaintiff's ERISA claim, even liberally construed, may not go forward. In his Complaint, Plaintiff states his claim under § 510 of ERISA. Section 510 provides in pertinent part that

> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140; *Sandberg v. KPMG Peat Marwick, L.L.P.,* 111 F.3d 331, 333 (2d Cir.1997). "Section 510 was designed primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister v. Cont'l Grp., Inc.,* 859 F.2d 1108, 1111 (2d Cir.1988) (citation omitted); *see also Ingersoll–Rand Co. v.*

*McClendon,* 498 U.S. 133, 143, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) ("By its terms § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting."). "There is, however, no cause of action under section 510 where the loss of pension benefits 'was a mere consequence of, but not a motivating factor behind, a termination of employment.' " *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997) (quoting *Dister,* 859 F.2d at 1111).

**\*8** Plaintiff has failed to allege that an applicable plan exists or that he was covered under such a plan in such a way as to trigger protections under ERISA. Further, Plaintiff's Response to Defendants' Motion simply makes vague references to a claim that was submitted to an insurance company that he is trying to locate and contains no argument affirmatively identifying himself as a harmed beneficiary. Therefore, Plaintiff's ERISA claim is dismissed. However, in light of Plaintiff's *pro se* status and absent any reason to conclude that Defendants would be prejudiced by amendment, the Court grants Plaintiff leave to amend this claim.

*3. The State Law Claims*
So long as a district court's original jurisdiction was not founded solely on diversity of citizenship, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court may retain pendent jurisdiction over state law claims whenever the state law claim(s) and the federal claim(s) (through which original subject matter jurisdiction was obtained), "derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

"Pendent jurisdiction is 'a doctrine of discretion' for the district court." *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1054 (2d Cir.1990) (quoting *Gibbs,* 383 U.S. at 726). "[T]he doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

In the instant case, the Court concludes that all of the claims alleged arise from a "common nucleus of

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

operative fact"—Plaintiff's discharge from Atlas. Because the Court has found that at least one federal claim survives Defendants' Motion to dismiss, and absent any other showing of prejudice or argument as to why it would be imprudent for the Court to exercise jurisdiction over Plaintiff's state law claims, the Court exercises its discretion to retain jurisdiction over Plaintiff's state law claims.

### a. Breach of Contract

Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998). "[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by any party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987); *accord DePetris v. Union Settlement Ass'n, Inc.,* 86 N.Y.2d 406, 410, 633 N.Y.S.2d 274, 657 N.E.2d 269 (1995).

"[A]n employer's virtually unfettered power to terminate an at-will employee does not negate its duty to abide by promises made prior to termination." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339 (2d Cir.2000) (citing *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1196 (2d Cir.1989)). However,

> **\*9** [t]o sustain a cause of action for breach of an employment contract, a discharged employee must show that the employee handbook, or some other enforceable employment contract, contained an express limitation prohibiting the employee's discharge except for cause, and that the employee specifically relied upon this language.

*Howley v. Newsday, Inc.,* 215 A.D.2d 729, 627 N.Y.S.2d 85, 86 (App.Div.1995). "The complaint [in a breach of contract case] 'must, at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.' " *Power Travel Int'l., Inc. v. American Airlines, Inc.,* 257 F.Supp.2d 701, 704 (S.D.N.Y.2003) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276, 286 (S.D.N.Y.1991)).

In this case, Plaintiff states that he reached an oral, or at the very least, an implied agreement with Atlas that if he worked for 90 days as a probationary employee he would receive "certain privalages [sic] offered by the company." Pl.'s Resp. at 13. Construed liberally, this is clearly a conditional agreement—if Plaintiff were to perform one task (satisfactorily perform his job duties for 90 days), then Atlas would confer certain benefits. However, Plaintiff contends that by unlawfully firing him before he worked for 90 days, Atlas breached its contract. The Court concludes that—to the extent Plaintiff had an oral or implied contract—he has misidentified the contract as one for a 90–day term of employment. Taking Plaintiff's allegations as true and drawing all inferences in his favor, the Court concludes that Plaintiff did not have a contract for a 90–day term of employment; rather, he had been guaranteed benefits *if he worked* for 90 days. Because Plaintiff has failed to allege (1) the existence of a contract, (2) performance, and (3) breach, the Court grants Defendants' Motion to dismiss Plaintiff's breach of contract claim. Further, the Court concludes that this claim is deficient as a matter of law and could not be remedied by better pleading; therefore, the Court dismisses this claim with prejudice and does not grant Plaintiff leave to amend. *Foman,* 371 U.S. at 182.

### b. Breach of the Implied Covenant of Good Faith and Fair Dealing

"New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002). Therefore, a claim alleging breach of the implied covenant of good faith and fair dealing "can survive a motion to dismiss 'only if it is based on allegations different than those underlying the accompanying breach of contract claim.' " *ARI & Co. v. Regent Int'l Corp.,* 273 F.Supp.2d 518, 522 (S.D.N.Y.2003) (quoting *Siradas v. Chase Lincoln First Bank, N.A.,* No. 98 Civ. 4028, 1999 WL 787658, at \*6 (S.D.N.Y. Sept.30, 1999)).

**\*10** In this case, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is based on identical factual allegations to the ones underlying the breach of contract claim. Therefore, the Court grants

D'Entremont v. Atlas Health Care Linen Services, Co., LLC, Not Reported in F.Supp.2d...

2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

Defendants' Motion to dismiss this claim. Further, even granting Plaintiff's Complaint a liberal reading, the Court concludes that this claim in Plaintiff's case is inherently duplicative of his claim for breach of contract. Therefore, because the deficiency here is one of law and not based on a pleading error, the Court dismisses this claim with prejudice and does not grant Plaintiff leave to amend. *Foman,* 371 U.S. at 182.

### c. Defamation

The elements of a defamation claim in New York are "a false statement, published [by the defendant] without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and, it must either cause special harm [to] or constitute defamation per se [of the plaintiff]." *Feldman v. Edwab,* No. 1:10–CV–0261, 2011 WL 1298717, at *5 (N.D .N.Y. Mar. 31, 2011)* (Kahn, J.) (quoting *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (App.Div.1999)) (internal quotation marks omitted); *accord O'Neill v. N.Y.U.,* 97 A.D.3d 199, 944 N.Y.S.2d 503, 513 (App.Div.2012).

In this case, Plaintiff alleges that statements made by Defendants Doe and Wakeman were defamatory under New York law. Compl. ¶ 85. However, even under a liberal reading of his Complaint, Plaintiff fails to specify what statements were allegedly defamatory or to flesh out this claim with anything other conclusory allegations that the statements were made with malice. *Id.* Therefore, the Court grants Defendants' Motion to dismiss Plaintiff's defamation claim. In an abundance of caution and in light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to amend this claim.

### d. Intentional Infliction of Emotional Distress (IIED)

In order to state a claim for IIED in New York, a plaintiff must show: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999). The standard for stating a valid claim is "rigorous, and difficult to satisfy" because the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v.*

*N.Y. Post Co.,* 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (internal quotation marks and citation omitted). Further, IIED is a "highly disfavored claim [ ] under New York law." *Williams v. City of Mount Vernon,* 428 F.Supp.2d 146, 160 (S.D.N.Y.2006) (citation and internal quotation marks omitted); *see also Seltzer v. Bayer,* 272 A.D.2d 263, 709 N.Y.S.2d 21, 23 (App.Div.2000) ( "This threshold of outrageousness is so difficult to reach that, of the intentional infliction of emotional distress claims considered by the Court of Appeals, every one has failed because the alleged conduct was not sufficiently outrageous." (citation and internal quotation marks omitted)).

**\*11** As with Plaintiff's defamation claim, Plaintiff's IIED claim—even when granted a liberal reading—consists only of a number of conclusory statements and a recitation of the generic elements of an IIED claim. Therefore, the Court grants Defendants' Motion to dismiss the IIED claim. In an abundance of caution and in light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to amend this claim.

### e. Civil Conspiracy

The basis for this claim is unclear. In his Response to Defendants' Motion, Plaintiff cites Georgia state case law as well as 42 U.S.C. §§ 1983 and 1985. Pl.'s Resp. at 14–15. Further, the Court is unable to discern what tortious acts might serve as the predicates for this claim. Even construing Plaintiff's Complaint and submissions with the utmost liberality, both the legal and factual bases for this claim are unclear. Therefore, the Court grants Defendants' Motion to dismiss the civil conspiracy claim. However, in an abundance of caution and in light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to amend this claim.

## B. Plaintiff's Motion

Because the court grants Plaintiff leave to amend his Complaint consistent with the terms of this Memorandum–Decision and Order, the Court denies Plaintiff's Motion to amend as moot.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that Defendants' Motion (Dkt. No. 25) to dismiss is **GRANTED in part and DENIED in part**

consistent with this Memorandum–Decision and Order; and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 25) to dismiss Plaintiff's ADA claims against all Defendants other than Defendant Wakeman is **DENIED; and it is further**

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED in part** in accordance with this Memorandum–Decision and Order such that: (1) Plaintiff's ADA claim against Defendant Wakeman is **DISMISSED with prejudice;** (2) Plaintiff's ADA claim against Defendant Jane Doe is **DISMISSED with prejudice;** (2) Plaintiff's ERISA claim is **DISMISSED without prejudice;** (3) Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing are **DISMISSED with prejudice;** and (4) Plaintiff's claims for defamation, IIED, and civil conspiracy are **DISMISSED without prejudice;** and it is further

**ORDERED,** that Plaintiff's Motion (Dkt. No. 37) is **DENIED as moot;** and it is further

**ORDERED,** that if Plaintiff wishes to amend his Complaint (Dkt. No. 1) and proceed with this action, he must do so **within thirty (30) days** from the date of filing of this Memorandum–Decision and Order. If Plaintiff does not comply with this Memorandum–Decision and Order and file an amended complaint in a timely fashion, however, the Complaint (Dkt. No. 1) will remain the operative pleading and only those claims not dismissed by this Memorandum–Decision and Order will remain; and it is further

**ORDERED,** that the Clerk serve a copy of this Memorandum–Decision and Order on all parties.

**\*12 IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 998040, 56 Employee Benefits Cas. 1289, 27 A.D. Cases 1552

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3542021
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Oscar ROSERO, Sr., Plaintiff,
v.
SUPREME SYSTEMS INC. and
George Modest, Defendants.
Oscar Rosero, Sr., Plaintiff,
v.
Supreme Systems Inc., Defendant.

Nos. 11 CV 4062(CBA)(LB), 11 CV 4063(CBA)(LB).
|
April 24, 2012.

**Attorneys and Law Firms**

Oscar Rosero, Sr., Brooklyn, NY, pro se.

Jessica N. Tischler, Louis Pechman, Berke–Weiss &
Pechman LLP, New York, NY, for Defendants.

### REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

**\*1** Plaintiff, Oscar Rosero, Sr., brings this *pro se*
action pursuant to Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII")
and the Americans with Disabilities Act, 42 U.S.C. §
12101, *et seq.* ("ADA"). Plaintiff alleges that defendants
Supreme Systems Inc., ("Supreme") and George Modest
("Modest") discriminated against him on the basis of his
race, national origin, and disability. Defendants move
to dismiss plaintiff's complaints pursuant to Rules 12(b)
(1), 12(b)(6), and 8(a) of the Federal Rules of Civil
Procedure. The Honorable Carol B. Amon, Chief Judge,
referred defendants' motions to me for a Report and
Recommendation in accordance with 28 U.S.C. § 636(b).
For the following reasons, defendants' motion pursuant
to Rule 12(b)(1) should be denied and defendants' motion
pursuant to Rules 8(a) and 12(b)(6) should be granted.
I further recommend that plaintiff should be granted 30
days leave to amend his complaint should this report be
adopted as set forth below.

### BACKGROUND

Plaintiff was employed by defendant Supreme from
September 10, 2002 to January 31, 2011. (Tischler
Decl. Ex. D, p. 5., ECF No. 14.) During this period,
plaintiff's job title was "driver/messenger." (*Id.* at Ex.
C, p. 5.) Plaintiff filed two complaints against Supreme
with the New York State Division of Human Rights
("NYSDHR") on January 6, 2011 and February 11, 2011
respectively. (Id. at Ex. C and Ex. D.) On June 28, 2011
and May 27, 2011, NYSDHR dismissed plaintiff's claims,
finding no probable cause to believe that defendant
Supreme engaged in any discriminatory practice based on
plaintiff's race or national origin. (Id. at Ex. E and Ex. F.)
After adopting the findings of the NYSDHR, the Equal
Employment Opportunity Commission ("EEOC") issued
plaintiff right to sue letters on July 26, 2011 for the January
1, 2011 complaint (*id.* Ex. A, p. 6.) and on August 8, 2011
for the February 11, 2011 complaint. (*Id.* Ex. B, p. 6.)

Plaintiff commenced two separate actions in this court.
The first was filed on August 19, 2011. (Compl., p. 5., ECF
No. 1., Doc. No. 11–CV–4062.) The complaint alleges
defendants discriminated against him in employment in
violation of Title VII of the Civil Rights Act of 1964
("Title VII") and the American with Disabilities Act
of 1990 ("ADA"). (*Id.* at p. 1.) The complaint names
plaintiff's employer, Supreme, and a company dispatcher,
Modest, as co-defendants. (*Id.*) In his first complaint,
plaintiff asserts that he was discriminated against based
on race, national origin, and disability. (*Id.* at p. 3.)
Plaintiff describes himself as 54 years old, "Latin,"
"Ecuadorian," and having "[heel] spurs," and "lower back
pains." (*Id.*)[1] Under the heading "discriminatory conduct
of which I complain in this action," plaintiff checked boxes
for termination of employment, failure to accommodate
plaintiff's disability, unequal terms and conditions of
plaintiff's employment, and retaliation. Under "other," he
wrote "wrongful[ ] payout." (*Id.*) In the blank space for
plaintiff's factual allegations, plaintiff wrote:

[1]     Plaintiff listed his age and birth date on the
form complaint. (*Id.* at 3.) Although he originally
checked the box for claims brought under the
Age Discrimination in Employment Act of 1967
("ADEA"), he subsequently crossed out that mark.
(*Id.* at 1.) Accordingly, the Court does not construe
the complaint as alleging an ADEA claim.

**\*2** "I let Mike the dispatch know about my medical issued fesical disability the I cant do it, lifting, carry, pushing heavy load. So Mike dispatch. informe to Mr. George Modes Supreme Systems Supervicer I think I was refusing to perform my job duty so they dit not believed me and they think I dit want to do my job."
(Compl., p. 5., ECF No. 1., Doc. No. 11–CV–4062) (spelling as in original.)

Plaintiff's second complaint, also filed on August 19, 2011, is nearly identical except Supreme is the sole defendant. (Compl., p. 5., ECF No. 1., Doc. No. 11–CV–4063.) Plaintiff checked boxes on the form complaint indicating he was discriminated against based on race and disability. (*Id.* at p. 1.) Under the discriminatory conduct heading, plaintiff checked boxes for termination of employment, failure to promote, failure to accommodate a disability, retaliation and again under "other" wrote "wrongful[ ] paid out." (*Id* at p. 3.) In addition, plaintiff wrote:

> "I let Mike the dispach know about my medical issued disability fisical the I canot do it not lifting, carry, pushing heavy load. So Mike dispach informe to Mr. Georde Modes Supreme Systems supervicer. He think I was refusing to perform my duty job so they Mike and George di not believed and concideration, regarding my fiscial disability."

(Compl., p. 5., ECF No. 1., Doc. No. 4063) (spelling as in original.)

Defendants attach plaintiff's NYSDHR charges which illuminate plaintiff's potential claims. In the first NYSDHR charge, plaintiff stated that he was given less working hours, demoted, and was not paid for all the hours he worked. (Tischler Ex. C, p. 6.) Plaintiff also asserted that employees of other races and ethnicities were treated better and received higher asserted that employees of other races and ethnicities were treated better and received higher salaries. (*Id.*) Finally, plaintiff claimed that after he complained to defendant Modest, the "discrimination increased." (*Id.*) Plaintiff did not specifically describe how the discrimination increased, but states that employees of other races received the best jobs. (*Id.*)

Plaintiff's second NYSDHR charge alleged that Connor, the dispatcher, offered plaintiff "worse jobs" than he offered to workers of other nationalities. (Tischler Ex. D, p. 7.) Plaintiff again alleged Supreme had not paid him for certain jobs he had completed. (*Id.*) Plaintiff further alleged that Supreme paid him a smaller percentage of the proceeds per job than other coworkers in his position. (*Id.*) Finally, plaintiff asserted that both Modest and Connor called him to the office and asked him whether he had filed a complaint. (*Id.*) When plaintiff responded in the affirmative, Modest and Connor allegedly took plaintiff's "walkie talkie" and fired him. (*Id.*)

### DISCUSSION

**I. Standard of Review**
On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Iqbal,* 129 S.Ct. at 1950. Nonetheless, "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *see also Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) ("We liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions 'to raise the strongest arguments they suggest.' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)) (other citations omitted). In deciding a motion to dismiss, the Court may consider, in addition to the complaint, documents that plaintiff attached to the pleadings, documents referenced in the complaint, documents that plaintiff relied on in bringing the action which were in plaintiff's possession or of which plaintiff had knowledge, and matters of which judicial notice may be taken. *Chambers,* 282 F.3d at 152–153. [2]

2   Defendant attaches the charges of discrimination that plaintiff filed with the NYSDHR and the NYSDHR decisions dismissing his charges. (Tischler Decl. at Ex. C, D, E, F.) The Court may properly consider these documents when deciding the instant motion. *Morris v. David Lerner Assocs.,* 680 F.Supp.2d 430, 436 (E.D.N.Y.2010)* ("[W]ith respect to administrative filings (such as the NYSDHR and the EEOC) and decisions, the Court may consider such documents because they are public documents filed in state administrative proceedings, as well as because they are integral to plaintiff's claims."); *Muhammad v. N.Y. City Transit Auth.,* 450 F.Supp.2d 198, 204 (E.D.N.Y.2006) (citations omitted) (finding that an EEOC charge of discrimination and the agency determination could be properly considered on a motion to dismiss because plaintiff expressly referred to the charge in her complaint and the documents "are both public records, of which this Court may take judicial notice.") Therefore no Local Civil Rule 12.1 or 56.2 notice is required and the Court need not convert the instant motion to one for summary judgment.

## II. Plaintiff's Claims Against Defendants Supreme Systems and Modest

### A. Claims Pursuant to Title VII and the ADA

#### 1. Individual Liability

 **\*3** There is no individual liability under either Title VII or the ADA. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 221 (2d Cir.2004) ( "[I]ndividuals are not subject to liability under Title VII.") (citation omitted); *Fox v. State Univ. of N.Y.,* 497 F.Supp.2d 446, 449 (E.D.N.Y.2007) ("[T]here is no individual liability under Title I or Title II of the ADA.") (citations omitted). Accordingly, to the extent that plaintiff seeks to hold Modest or any other individual employee or supervisor of Supreme liable under Title VII or the ADA, plaintiff's claims should be dismissed.

#### 2. Exhaustion of Administrative Remedies

Under Title VII and the ADA, a plaintiff must file a timely charge with the EEOC or an equivalent state or city agency 3 and receive a "right to sue" letter from the EEOC before filing an action in federal court. *See* 42 U.S.C. § 2000e–5(f)(1) ("[T]he Commission ... shall so notify the person aggrieved and within ninety days after the giving

of such notice a civil action may be brought ... by the person claiming to be aggrieved."); 42 U.S.C. § 12117(a) (incorporating the exhaustion procedures set forth in 42 U.S.C. § 2000e–5 into the ADA); *McPherson v. N. Y. City Dept. of Educ.,* 457 F.3d 211, 213 (2d Cir.2006) ("A private plaintiff under Title VII must satisfy two conditions before commencing suit in federal court."). "This exhaustion requirement is an essential element of Title VII's statutory scheme, and is designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Shah v. N. Y. State Dept. of Civil Serv.,* 168 F.3d 610, 614 (2d Cir.1999) (internal quotation marks and citations omitted). "[D]efendants are entitled to insist that plaintiffs' exhaust their administrative remedies through the EEOC. *Francis v. City of N. Y.,* 235 F.3d 763, 768 (2d Cir.2000).

3   Plaintiff properly filed a timely complaint with the NYSDHR.

Defendants argue that plaintiff's ADA claims should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction as plaintiff failed to exhaust his administrative remedies. However, exhaustion of administrative remedies is not a jurisdictional requirement, but rather a condition precedent to bringing an ADA claim in federal court. *Id.* ("We hold that presentation of a Title VII claim to the EEOC is not a jurisdictional [prerequisite], but only a precondition to bringing a Title VII action that can be waived by the parties or the court.") (internal quotation marks and citation omitted); *Jonas v. Solow Mgmt. Co.,* No. 99 Civ. 8583(RMB)(KNF), 2005 U.S. Dist. LEXIS 798, at *7– 8 (S.D.N.Y. Jan. 3, 2005) ("As a precondition to filing an ADA claim in federal court, a plaintiff must first file timely a complaint with the EEOC. However, this requirement is not jurisdictional.") (citations omitted). Failure to exhaust is properly raised as a failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, not as a lack of subject matter jurisdiction under Rule 12(b)(1). Accordingly, defendants' motion to dismiss pursuant to Rule 12(b)(1) is denied and the Court considers plaintiff's motion under Rule 12(b)(6). *See Ayala v. Metro One Sec. Sys., Inc.,* No. 11–CV– 233 (JG)(ALC), 2011 WL 1486559, at *2–3 (E.D.N.Y. April 19, 2011) (noting that defendant's 12(b)(1) motion to dismiss for failure to exhaust administrative remedies is "properly raised in a motion to dismiss under Rule 12(b) (6) for failure to state a claim," and proceeding to review the argument under Rule 12(b) (6).)

**\*4** Defendants argue that plaintiff's ADA claims should be dismissed for two reasons: (1) plaintiff failed to allege discrimination based on disability in the NYSDHR charge and; (2) the ADA claim was not "reasonably related" to the NYSDHR charge. (Def.'s Mem. Of Law in Supp. of Mot. to Dismiss Compl. pp. 8–9., ECF No. 13.) There are three situations in which a complaint filed with the District Court could be considered "reasonably related" to the agency charge: (1) claims that would "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) claims that allege "retaliation by an employer against an employee for filing an [agency] charge"; and (3) claims that allege "further incidents of discrimination carried out in the same manner alleged in precisely the [agency] charge." *Terry v. Ashcroft,* 366 F.3d 128, 151 (2d Cir.2003) (internal quotations omitted and citations omitted).

Plaintiff's complaint of disability discrimination here is not reasonably related to the charge he filed with the NYSDHR. Plaintiff's NYSDHR charge did not mention plaintiff's heel spurs, lower back pain, or any other physical or mental condition that would have placed defendant or the agency on notice of plaintiff's claims under the ADA. The Second Circuit has consistently held that where a complaint does not allege facts that would place the employer or the agency on notice of discrimination based on a protected category not mentioned in the underlying charge of discrimination, the claims are not reasonably related. *See Williams v. N.Y. City Hous. Auth.,* 458 F.3d 67, 70–71 (2d Cir.2006) (discussing three District Court decisions where the court properly dismissed claims as unrelated); *see also Sotolongo v. N.Y. Transit Auth.,* 63 F.Supp.2d 353, 360 (S.D.N.Y.1999) (dismissing ADA claim because "plaintiff never filed a charge of disability discrimination with the [agency]" and the ADA claim was unrelated to the Title VII and ADEA claims in the underlying complaint), *aff'd,* 216 F.3d 1073 (2d Cir.2000). Here, plaintiff failed to exhaust his ADA claims and thus, plaintiff's disability claims under the ADA should be dismissed. Plaintiff should be denied leave to replead these claims because the 300–day statutory filing period for filing an ADA complaint has passed. *See Harris v. City of N.Y.,* 186 F.3d 243, 247 (2d Cir.1999) (noting that 42 U.S.C. § 2000e–5(e) is incorporated in the ADA by reference in 42 U.S.C. § 12117(a).) [4] Accordingly, plaintiff's claims under the ADA should be dismissed with prejudice. **3. Title VII** "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*Quoting Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

[4]  Assuming disability discrimination occurred on February 1, 2011, plaintiff's alleged date of termination, any charge complaining of disability discrimination had to be filed by November 28, 2011.

**\*5** In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court reversed a Second Circuit opinion requiring the plaintiff to plead a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), by showing: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) that circumstances surrounding the adverse action suggested discrimination based on plaintiff's protected status, in order to survive a motion to dismiss. *Swierkiewicz,* 534 U.S. at 510. Instead the Supreme Court interpreted the *McDonnell Douglas* framework as "an evidentiary standard, not a pleading requirement," and held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination...." *Id.* at 506 and 515. However, since the Supreme Court's rulings in *Twombly* and *Iqbal* "questions have been raised as to *Swierkiewicz's* continued validity." *Goodman v. Port Auth. of N.Y. and N.J.,* No. 10–CV–08352, 2012 WL 664531, at 4\* (2d Cir. Feb. 29, 2012) (noting the Second Circuit has refrained from addressing the question.) (citations omitted). Nonetheless regardless of the standard applied, plaintiff's allegations here would fail to state a claim. *See e.g., Hedges v. Town of Madison,* No. 10–CV–1566, 2012 WL 101199 at 1\* (2d Cir. Jan.13, 2012) (Second Circuit declining to resolve the issue where plaintiff's claims "fail[ed] any conceivable standard of pleading.")

Plaintiff checks the boxes on the form complaint for race and national origin discrimination. However plaintiff alleges the following: (1) plaintiff could not lift, carry, or push heavy loads due to his condition (*see* Compl., p. 4., ECF No. 1., Doc. No. 11–CV–4062); (2) he discussed his "medically issued [physical] disability" with the dispatcher, Mike Connor ("Connor"), who "informe[d]"

him to defendant Modest (*id.*); and (3) Modest notified plaintiff he was not fulfilling his job duties. (Id.) Plaintiff's only reference to discrimination based on race or national origin are the boxes he checked on the form complaint. This is insufficient and therefore, plaintiff's race and national origin claims should be dismissed. *Hedges,* 2012 WL 101199 at 2* (holding that even under the "most minimal [ ] notice of pleading standards, a plaintiff is still required to give fair notice to the defendants of the factual bases" of the claims.)

Similarly, plaintiff states no facts regarding retaliation. In order to maintain a claim of unlawful retaliation under Title VII, a plaintiff must show that: "(1) [he] was engaged in a protected activity; (2) the employer was aware of that activity; (3)[he] suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir.2012) (citations omitted). A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotations and citations omitted).

**\*6** Although plaintiff fails to allege that he engaged in any protected activity, it is clear that defendant's terminated him after he filed a discrimination charge. However, plaintiff's bare assertion that "they [don't] believe[ ] me and they think I [don't] want to do my job," does not allege a claim for retaliation. As plaintiff fails to allege facts to support his claims of race or national origin discrimination or for retaliation, these claims should be dismissed.

### III. Leave to Replead

As plaintiff is proceeding pro se, he should be given the opportunity to amend his complaints prior to their dismissal for failure to state a claim "because we cannot rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Shomo v. City of N.Y.,* 579 F.3d 176, 184 (2d Cir.2009) (citations omitted). As the Court cannot rule out the possibility that plaintiff could allege facts to state a discrimination and/or a retaliation claim, the Court should afford him the opportunity to file an amended complaint. [5] In the NYSDHR charge plaintiff alleged

that he was paid a lower percentage of the proceeds per job than employees of other races and ethnicities. (*See* Tischler Ex. C and Ex. D.) Additionally, plaintiff alleged that discrimination against him increased after he filed an internal complaint, (Tischler Ex. C, p. 6.), and that he was dismissed after being asked whether he had filed a complaint with the NYSDHR. (Tischler Ex. D, p. 7.) These facts could be repled to state a claim for discrimination and/or for retaliation. Furthermore, plaintiff has exhausted the administrative remedies for such claims. Therefore, if this report is adopted, plaintiff should be granted 30 days leave to file an amended complaint.

[5]    Plaintiff may also be attempting to bring a claim under state or federal labor laws. (*See* Pl.'s Aff. in Resp. of Mot. to Dismiss the Compl.) For example, plaintiff's underlying NYSDHR charge alleges that defendants failed to properly pay plaintiff for work he had done. (*See* Tischler Ex. C, p. 6.) Furthermore, in plaintiff's response to defendant's motion to dismiss, plaintiff attached a pay schedule indicating specific instances when he was paid less than what he was owed. (*See generally* Pl.'s Aff. in Resp. of Mot. to Dismiss the Compl.)

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss pursuant to Rule 12(b)(1) should be denied. Defendants' motion to dismiss pursuant to Rules 8(a) and 12(b)(6) should be granted. All claims against defendant Modest should be dismissed with prejudice. Plaintiff's claims against defendant Supreme under the ADA should be dismissed with prejudice. Plaintiff's complaints regarding race and national origin discrimination, as well as retaliation, should be dismissed, but plaintiff should be granted 30 days leave to amend. Should this Report be adopted, plaintiff should contact the Pro Se Office for instructions regarding how to amend a complaint. An amended complaint would completely replace the original complaints that were filed.

### FILING OF OBJECTIONS TO
### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have

fourteen days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**\*7** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3542021

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.